EASTERBROOK, Circuit Judge.
 

 For more than twelve years the Dybel family business has avoided its obligations under the labor laws. Now it contends that the wronged employees cannot receive their remedy, because while it waged a rear guard action before the Board and this court, the corporation that had employed these persons distributed its assets to family members. It even contends that its ability to string out the process is an independent bar to enforcement. Unfazed, the
 
 *336
 
 Board ordered the Dybels to pay personally. So they must.
 

 In 1980 the International Measurement and Control Company (“Manufacturing”)— which made electronic controls and transducers invented by Frank and William Dy-bel — fired three employees who joined a union and complained about working conditions. One employee believed that the cat excrement the Dybels allowed to accumulate in the plant was making her ill. The Dybels closed the plant to clean it, falsely telling their workers that the health department had directed this, and on reopening the facility did not recall the union supporters. In 1982 the Board concluded that in doing these things Manufacturing committed an unfair labor practice and must make the employees whole, a remedy that includes back pay. 261 N.L.R.B. 1323 (1982). (One of the Dybels testified at the Board’s hearing that he viewed union organizing as “horseshit.” Wrong sentiment, wrong setting, wrong species.)
 

 Manufacturing neither complied nor sought judicial review but waited for the Board to apply for enforcement. When it did so, we enforced the order without published opinion. 732 F.2d 158 (7th Cir.1984). Manufacturing next waited for the Board to calculate the amount of back pay that was due for the period before it offered reinstatement. In 1985 the Board fixed this at a little less than $50,000, plus interest. 277 N.L.R.B. 962 (1985). Once again, Manufacturing neither complied nor sought judicial review but waited for the Board to apply for enforcement. When it did so, we enforced the order without published opinion. 808 F.2d 837 (7th Cir.1986).
 

 Manufacturing did not comply with our order, contending that the cupboard was bare. In November 1984 Manufacturing began selling its assets and turning the proceeds over to members of the Dybel family. The process was completed in September 1985 (shortly before the Board’s second order). All of these payments, Manufacturing contends, were on account of accumulated salary obligations rather than the family’s stock ownership. Since 1982 Manufacturing had been losing money, and it had deferred executive compensation. Even after liquidating all of its assets, Manufacturing contends, it had not satisfied the debt to its managers.
 

 Although Manufacturing shut down, the Dybels continued to sell their products. They subcontracted the manufacture of the devices (Manufacturing’s role in the business) while two other corporations and two partnerships carried on: IMCO Sales Co. assembled and sold the devices; IMCO Service Co. installed and repaired the devices; Zoe Enterprises owned and leased the premises to these two firms; Dybel Enterprises provided capital for these three.
 

 Not satisfied with Manufacturing’s explanation, the Board opened supplemental proceedings and concluded that “the manner in which [Manufacturing's assets were distributed among the other entities and the individual Dybels demonstrates intent to avoid backpay obligations.” 304 N.L.R.B. No. 94 at 7-8 (1991). It concluded that the four remaining Dybel businesses and Manufacturing were a single entity, on a variety of theories — common employer, alter ego, corporate group liability — and that all four, plus Frank, Margaret, William, and Palette Dybel personally, are responsible for the back pay obligation, which with interest still mounting exceeds $130,000. For a third time, the Dybels neither complied nor sought judicial review but waited for the Board to apply for enforcement. It has done so.
 

 Calling the interest “an enormous windfall”, the Dybels say that enforcing the award against them personally is “Fundamentally Unfair.” That takes nerve! They (or their corporate creatures) could have paid a decade ago and cut short the accumulation of interest. Interest is not some kind of penalty. “Prejudgment interest is an element of complete compensation”.
 
 West Virginia v. United States,
 
 479 U.S. 305, 310, 107 S.Ct. 702, 706, 93 L.Ed.2d 639 (1987). See also, e.g.,
 
 General Motors Corp. v. Devex Corp.,
 
 461 U.S. 648, 655-56, 103 S.Ct. 2058, 2062, 76 L.Ed.2d 211 (1983). It reimburses victims for the time value of money, the benefit of which the workers lost and Dybels have had during the litiga
 
 *337
 
 tion. “[T]he passage of time ... is a reason to award interest, not to deny it.”
 
 In re Oil Spill by the Amoco Cadiz,
 
 954 F.2d 1279, 1334 (7th Cir.1992). Cf.
 
 NLRB v. Ironworkers,
 
 466 U.S. 720, 104 S.Ct. 2081, 80 L.Ed.2d 715 (1984) (long administrative delay, while back pay accumulates, does not prevent enforcement of the Board’s award);
 
 NLRB v. J.H. Rutter-Rex Manufacturing Co.,
 
 396 U.S. 258, 90 S.Ct. 417, 24 L.Ed.2d 405 (1969) (same). The funds the Dybels withdrew from Manufacturing have been earning a return for them since 1984 and 1985, or, equivalently, have enabled the Dybels to avoid the interest they would have had to pay to borrow the same amount. Meanwhile the wronged employees have lacked funds that they could have invested (or that would have enabled them to avoid the expense of borrowing). The return on the money belongs to the victim, not the wrongdoer, and interest is the means by which this transfer is accomplished.
 

 No more persuasive is the Dybels’ contention that the Board acted too late— that is, beyond the six months that § 10(b) of the NLRA, 29 U.S.C. § 160(b), allows for a charge — in adding them, and their other firms and partnerships, as parties. There was no need to do so until they liquidated the firm that was properly named as the employer. Supplemental proceedings to recover from the distributees are normal under state law and entirely appropriate in labor law.
 
 NLRB v. C.C.C. Associates, Inc.,
 
 306 F.2d 534, 539 (2d Cir.1962). See also, e.g.,
 
 G & M Lath Plaster Co.,
 
 252 N.L.R.B. 969, 978 (1980), enforced, 670 F.2d 550 (5th Cir.1982). If, as the Board found, the two partnerships, three, corporations, and four Dybels are but a single employer, then notice to one was notice to all.
 
 NLRB v. Deena Artware, Inc.,
 
 361 U.S. 398, 402, 80 S.Ct. 441, 443, 4 L.Ed.2d 400 (1960). Cf.
 
 Central States Pension Fund v. Slotky,
 
 956 F.2d 1369, 1375 (7th Cir.1992). And if they are not, then everyone other than the defunct Manufacturing prevails without regard to § 10(b). Either way, §. 10(b) plays no role in the outcome.
 

 Having told us that the Board took too long, the respondents also tell us that we should defer enforcement while the Board conducts a fourth hearing. The administrative law judge heard a member of the NLRB’s staff remark that Frank Dybel possesses firearms and had in the past made a threat of violence, a subject that acquired significance in light of an anonymous call stating that there might be a “security problem” at the hearing. Counsel and the AU discussed the phone call on the record at- the start of the hearing. Later the AU granted a motion to strike the dialog and said that she would attempt to prevent the Board from receiving a copy of the interchange.
 

 Administrative judges can’t rip pages out of transcripts, so the Board received the full proceedings of the hearing. Claiming that they learned this only recently, the respondents ask us to remand for a new decision at which the Board will be ignorant of the subject. Just how ignorance can be achieved — short of waiting for a new complement of members to take office — the respondents do not say. Nothing in the Board’s opinion suggests that its members were aware of, let alone influenced by, the
 
 contretemps.
 
 So there was no prejudice. A remand, with instructions to ignore something the members probably did not know in the first place, would backfire. It would be like remanding a case with instructions that none of the members of the Board think about Greenland anytime during the next month. The nature of the order would ensure its violation. At all events, the record shows that a copy of the transcript, including the pages that respondents say are not supposed to be there, was mailed to them in January 1990, and they did nothing to alert the General Counsel to this supposed “violation” of the AU’s order. They did not raise the subject at all before the Board, or in this court until April 1992. Such delay by persons who accuse the Board of taking too much time is imprudent. See also 29 U.S.C. § 160(e) (precluding court from considering issues not presented to Board, save in exceptional circumstances).
 

 
 *338
 
 Must the Dybels pay Manufacturing’s debt to the three employees? The Board devoted a page and a half to this question, citing two of its own opinions and no statutes or cases. Although it used the jargon of shareholders’ liability (“piercing the corporate veil” and so on), the extent to which investors are responsible for the corporate debts is a question of state law — for the National Labor Relations Act regulates employers, not shareholders or creditors. State law has something to say about the liability of investors who withdraw funds from a corporation in order to avoid paying its debts, but this comes under the heading of fraudulent conveyances rather than “veil piercing.” The Board’s reasoning concentrated on the transfer, so although it did not invoke the proper body of rules, it would be pointless to remand for the purpose of patching up the opinion.
 

 Manufacturing was incorporated in Illinois, which has adopted the Uniform Fraudulent Transfer Act. Ill.Rev.Stat. ch. 59 ¶¶101-12. Section 6(b) of the Act (H 106(b) in Illinois) provides: “A transfer made by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made if the transfer was made to an insider for an antecedent debt, the debtor was insolvent at that time, and the insider had reasonable cause to believe that the debtor was insolvent.” This rule fits our case like a glove. Manufacturing paid off debts to its insiders (past-due wages are debts) at a time when it was insolvent, and the insiders knew it. Respondents’ brief in this court
 
 proclaims
 
 the insolvency of the firm, as if that justified preferential payments to the managers. According to § 3(a), “[a] debtor is insolvent if the sum of the debtor’s debts is greater than all of the debtor’s assets at a fair valuation.” Respondents insist that Manufacturing ceased operations in July 1984 because of declining sales and increasing costs. Manufacturing says that it had promised to pay the four Dybels salaries aggregating $350,000 a year but had paid them nothing since 1981. By mid-1984 the debt to the Dybels approximated $600,000. Between July 1984 and the end of 1985, Manufacturing sold all of its assets and paid the proceeds (or delivered the assets), worth $221,000 in all, to the Dybels. This is their own reckoning, by which Manufacturing was insolvent in both 1984 and 1985.
 

 A creditor aggrieved by a fraudulent conveyance may avoid that transfer, requiring the preferred creditors to refund the money to the debtor. K 108(a)(1). Alternatively, “[i]f a creditor has obtained a judgment on a claim against the debtor, the creditor, if the court so orders, may levy execution on the asset transferred or its proceeds.” 11108(b). The NLRB, acting as a court for this purpose, used the latter approach, and quite properly. Manufacturing distributed to its insiders assets, including two yachts, a condominium, and several cars, worth three times the competing creditors’ claims. The Dybels received $221,-000 in 1984 dollars; the three creditor employees’ claims were worth approximately $70,000 in 1984 dollars. Accordingly, the claims may be satisfied from the Dybels’ assets.
 
 †
 

 Execution may be complicated by Frank Dybel’s death. In February 1992 respondents filed a notice of his death, Fed. R.App.P. 43(a), but did not identify or substitute the administrator of his estate or his personal representative despite the Board’s request. Actions to recover fraudulent conveyances survive the preferred creditor’s death. Frank Dybel’s successor seems as devoted as he was to a policy of passive resistance to the Board. Rule 43(a) provides, among other things, that “substitution shall be effected in the court of appeals in accordance with this subdivision.” Any suggestion of death filed under Rule 43(a) in a case that does not abate on death should identify the successor in interest. We direct respondents to identify within seven days the administrator of
 
 *339
 
 Frank Dybel’s estate or equivalent representative, who shall be substituted and bound by our judgment enforcing the Board’s order. Cf.
 
 McSurely v. McClellan,
 
 753 F.2d 88, 97-99 (D.C.Cir.1985).
 

 Remaining for discussion is the Board’s order that IMCO Sales, IMCO Service, Zoe Enterprises, and Dybel Enterprises, also are liable for the back pay. The Board threw the book at these four entities — the hornbook, that is. The Board’s opinion is filled with blackletter terms such as alter ego and piercing the corporate veil. If the firms really are alter egos, then the surviving entities are liable for
 
 all
 
 of Manufacturing’s debts, not just its obligations under the labor laws. Once more, however, the NLRB neglects to identify the source of law. The Board cited four of its own cases and nothing else. Nary an Illinois opinion is to be found. Although this might be appropriate if it were enforcing simple provisions of federal statutes, the Board does not quote or even refer to any statute. Nothing in the Board’s portfolio gives it superintendence over how corporations under common ownership arrange their relations. Cf.
 
 United States v. Kimbell Foods, Inc.,
 
 440 U.S. 715, 99 S.Ct. 1448, 59 L.Ed.2d 711 (1979) (holding that, in the absence of a federal statute displacing it, state law supplies the legal rules even when the obligation runs directly to the United States). Although we do not rule out the possibility that the NLRB could create a federal common law of corporate groups, see Wilson McLeod,
 
 Shareholders’ Liability and Workers’ Rights: Piercing the Corporate Veil Under Federal Labor Law,
 
 9 Hofstra Lab.L.J. 115 (1991) (arguing that this is appropriate), the Board has not tried to do so. Its enduring disregard of the choice-of-law question, see
 
 Esmark, Inc. v. NLRB,
 
 887 F.2d 739, 755 n. 26 (7th Cir.1989), does not permit a court to defer to its non-resolution.
 

 The Board’s principal theory is that the four Dybel entities cooperated in the production and sale of the electronic devices: Manufacturing made them, Sales sold them, Service serviced them, Zoe owned the building, and Dybel Entérprises put up the dough. After Manufacturing folded, the Dybels contracted for the manufacture of the controls and went on selling them. Yet no state of which we are aware — and certainly not Illinois — holds members of brother-sister groups responsible for each other’s debts just because they are in the same line of business. See Phillip I. Blumberg,
 
 The Law of Corporate Groups
 
 § 8.03 (1987). States require more, such as systematic disregard of the corporate form or arranging one’s affairs to deceive creditors.
 
 SeaLand Services, Inc. v. Pepper Source,
 
 941 F.2d 519 (7th Cir.1991) (Illinois law); see also, e.g.,
 
 Perpetual Real Estate Services, Inc. v. Mi-chaelson Properties Inc.,
 
 974 F.2d 545 (4th Cir.1992) (Virginia law);
 
 Walkovszky v. Carlton,
 
 18 N.Y.2d 414, 276 N.Y.S.2d 585, 223 N.E.2d 6 (1966). If shareholders exercise control over a group of related corporations “in disregard of the separate corporate identity” of these firms,
 
 Esmark,
 
 887 F.2d at 759, the Board may consider all to be one; we held in
 
 Esmark,
 
 however, that an investor’s (or parent’s) participation in the management of a firm is not the same as disregarding the corporate form and does not permit the Board to lump all of the affiliated firms into a single enterprise.
 
 Id.
 
 at 760.
 

 The Dybels did not form IMCO Sales, IMCO Service, and the two partnerships to evade the labor laws. All four entities predated the first efforts to organize the employees. None of the employees was defrauded about the identity of his employer. There was no shell game; Manufacturing’s assets were bailed out to the Dybels, not to other family corporations. (Dybel Enterprises bought some assets from Manufacturing, which distributed the cash to-the Dybels, but the Board does not contend that the partnership disregarded Manufacturing’s separate existence or paid less than fair market value.) The Board’s observation that the corporations and partnerships “employ the same accounting firm and bank at the same institutions” hardly aids its cause. Under what legal rule does holding an account at the same bank as a sibling corporation justify ignoring the cor
 
 *340
 
 porate form? “[T]he Board may not disregard settled principles of corporate law.”
 
 Esmark,
 
 887 F.2d at 753. Dwelling on such common, and irrelevant, particulars reinforces the impression that the Board has tossed corporate law out the window and wants to hold all affiliated firms responsible for each other’s obligations to workers. We forbade such an approach in
 
 Esmark,
 
 a case the Board did not trouble to cite or distinguish. (Of course it was not discriminating against
 
 Esmark;
 
 it did not rely on, distinguish, criticize, or otherwise address, a single opinion of any state or federal court.)
 

 Nonetheless, the Board invoked a genuinely federal theory of liability to employees, a theory sufficient in these circumstances to support its order. Section 8(a) of the NLRA, 29 U.S.C. § 158(a), lists acts that are unfair labor practices “for an employer”. What is the “employer” for this purpose? Presumptively the corporation that writes the paychecks. But perhaps the “employer” is he who calls the tune, and not just whoever pays the piper. For decades the Board has treated the enterprise with effective direction over labor relations as the “employer,” and the Supreme Court has referred approvingly to both the “joint employer” and the “single employer” variants of this doctrine. E.g.,
 
 Radio & Television Broadcast Technicians v. Broadcast Service of Mobile, Inc.,
 
 380 U.S. 255, 256, 85 S.Ct. 876, 13 L.Ed.2d 789 (1965);
 
 South Prairie Construction Co. v. Operating Engineers,
 
 425 U.S. 800, 802-03, 96 S.Ct. 1842, 1843-44, 48 L.Ed.2d 382 (1976). We have held that the Board acts within its discretion in treating as a single employer firms that operate as an integrated enterprise and “exert[] significant control over” the employees in question.
 
 G. Heileman Brewing Co. v. NLRB,
 
 879 F.2d 1526, 1530 (7th Cir.1989); see also, e.g.,
 
 W. W. Grainger, Inc. v. NLRB,
 
 860 F.2d 244, 247 (7th Cir.1988);
 
 NLRB v. Western Temporary Services, Inc.,
 
 821 F.2d 1258, 1266-67 (7th Cir.1987). Here the Board wrote:
 

 [T]he facts establish that the five entities ... constitute a single employer. The Respondents contest this finding on the ground that the factor of joint control over labor relations is not present among all the entities and individuals named, because not all the corporations and partnerships had or have employees. For those Respondent entities that have or have had employees, however, labor relations authority has been shared by the Dybels. Thus, as to those entities, this criterion is satisfied. Because all other pertinent single employer criteria are met with respect to the five entities, and because there is no arms-length relationship among them, the single employer finding is warranted.
 

 304 N.L.R.B. No. 94 at 8. In other words, the Dybels used their three corporations and two partnerships to operate different aspects of one electronic-controls enterprise, having a single pool of employees to whom they applied a single labor-relations policy. Substantial evidence in the record supports this conclusion.
 

 Respondents do not deny that the corporations and partnerships embarked on a common enterprise, and that when Manufacturing shut down IMCO Sales took over its final-assembly functions while continuing to sell parts made by outside contractors. They do not deny that IMCO Sales hired new employees (some of whom used to work for Manufacturing) to carry out these tasks. They do not deny that the Dybels have one labor-relations policy. But they insist that Zoe Enterprises, Dybel Enterprises, and IMCO Service never had any employees and so cannot be a “single employer” with Manufacturing and IMCO Sales. We see how partnerships can lack employees. But IMCO Service Corporation? A. corporation must have employees; in what other way can it act? Maybe the Dybels mean that they were its only employees (independent contractors provided the service to purchasers of the electronic gizmos). No matter. Neither the Board nor this court requires that firms have employees to be part of a single employer. It is enough that they be part of a common enterprise with a common labor policy.
 
 NLRB v. Emsing’s Supermarket, Inc.,
 
 872 F.2d 1279, 1289 (7th Cir.1989). An entity
 
 *341
 
 can belong to the single employer by giving as well as by receiving directions about labor policy.
 

 We have now enforced the Board’s orders three times, and we remind the respondents that disobedience to these judgments is contempt of court.
 

 Enforced.
 

 †
 

 The Uniform Fraudulent Transfer Act became effective in Illinois at the beginning of 1990, after the Dybels drained Manufacturing of assets. The prior law required a showing of intent to hinder or defraud creditors. Ill.Rev.Stat. ch. 59 1J 4. The Board made such a finding, which we quoted in the text, so that the change of law does not matter and we need not decide whether the Uniform Act applies retroactively.