Robert B. REICH, Secretary
of Labor, Petitioner,

v.

SEA SPRITE BOAT COMPANY,
INCORPORATED,
Respondent.

No. 92–1650.

United States Court of Appeals,
Seventh Circuit.

Argued Feb. 22, 1995.

Decided March 17, 1995.

Rehearing and Suggestion for Rehearing
En Banc Denied May 9, 1995.*

John H. Secaras, Sol. Gen., Dept. of Labor, Chicago, IL, Cynthia L. Attwood, Ronald J. Gottlieb (argued), Marshall J. Breger, U.S. Dept. of Labor, Office of the Sol., Washington, DC, Ray Darling, Jr., Occupational Safety & Health Review Com'n, Washington, DC, for petitioner.

Floyd Babbitt, Donald J. Vogel (argued), Fagel & Haber, Chicago, IL, Frank J. Simutis, Ackman, Marek, Boyd & Simutis, Watseka, IL, for respondent.

Before EASTERBROOK, RIPPLE, and ROVNER, Circuit Judges.

EASTERBROOK, Circuit Judge.

Exercising its authority under the Occupational Safety and Health Act, the Department of Labor has required manufacturers to spray organic peroxides only within the confines of booths equipped with sprinkler systems. 29 C.F.R. § 1910.107(m)(1). The Department concluded that organic peroxides burn at the slightest provocation, producing an intense fire that must be contained (hence the booth) and extinguished quickly (hence

* Flaum, Circuit Judge, did not participate in the consideration of the suggestion for rehearing en banc.

the sprinkler system) lest it spread and endanger everyone at the work site.

■ In January 1986 one of the Department's inspectors paid a call on Sea Sprite Boat Company in Crescent City, Illinois. The firm builds recreational boats. Sea Sprite molds the boats' hulls and sprays each hull with a mixture of styrene, fiberglass, and methyl ethyl ketone peroxide. MEK–P, as this compound is abbreviated, is an organic peroxide that can ignite without a spark in the presence of other organic compounds. Its combustion releases more oxygen that it consumes, so the fire is particularly hard to extinguish. Sea Sprite knew about the combustion hazard and had plenty of water handy; it stored the spray applicator over a pail of water to prevent the mixture from igniting as it dripped; but Sea Sprite did not have a booth with a sprinkler system. The inspector issued a citation in May 1986 requiring Sea Sprite to comply with the regulation within six months. Sea Sprite did not contest this citation, which therefore automatically became a final order of the Occupational Safety and Health Review Commission. Compliance should have been achieved by November 1986—failure to obey the Commission's orders carries civil penalties whether or not a court has enforced them—but Sea Sprite carried on its business without change.

In January 1987 another inspector visited the premises. Sea Sprite was merrily spraying MEK–P without a sprinklered booth. In April 1987 the Department of Labor issued another citation. Sea Sprite did not contest this citation, which again became a formal order by operation of law. The third inspection followed hard on the heels of the April 1987 order; the inspector found that Sea Sprite was still in violation. Another citation followed. This one was contested. A year passed. In May 1988 Sea Sprite promised, as part of a settlement, to install a sprinklered booth within 60 days. Thus, two and a half years after the initial inspection, Sea Sprite had yet to comply and the Department of Labor had yet to levy a sanction of any kind.

Perhaps encouraged by the Department's forgiving nature to believe that it could thumb its nose at the law indefinitely, Sea Sprite ignored its settlement agreement. When another inspector arrived in December 1988, the firm was still spraying MEK–P without benefit of a sprinklered booth. Another citation for failure to abate an established violation followed; this time the inspector attached a price, proposing a penalty for $135,000. Sea Sprite did not contest the notification, which became a final and binding order on April 5, 1989.

Three years passed. Sea Sprite did not pay the penalty or install the required booth. The Occupational Safety and Health Administration then applied to this court for enforcement of the April 1989 order. Sea Sprite treated this application the same way it treated the regulation: by behaving as if it did not exist. Because Sea Sprite had not opposed the application, this court summarily enforced the administrative order and in May 1992 issued a decree providing in part that Sea Sprite must "[c]omply with the Commission's final orders ... requiring abatement of the enumerated violations of the OSH Act and payment of OSH Act penalties in the amount of $135,000.00".

Judicial order in hand, another inspector appeared at Sea Sprite's premises in July 1992. The firm was still spraying MEK–P on boat hulls and still lacked a sprinklered booth. By October 1992 Sea Sprite had not paid a penny (recall that the $135,000 had been due since April 1989) and had not conformed to the spraying regulation. Seven years of defiance were too much for the Department of Labor, which asked this court to hold Sea Sprite in contempt. Another two years of defiance were still to come—but let us not get ahead of the story.

We appointed Magistrate Judge Kauffman of the Central District of Illinois as our Special Master. Sea Sprite insisted that the Master could not require it to participate in discovery. Although Fed.R.App.P. 48 now presumptively gives appellate masters the power to compel the production of evidence, that rule did not come into force until December 1, 1994, and there was no comparable rule in 1992. We therefore delegated to the Master authority to oblige Sea Sprite to produce evidence. Among the items the Secretary sought was documentation of Sea

Sprite's financial status and ability to pay the penalty—or a new, larger, penalty for contempt of court. Sea Sprite resisted turning over such evidence, and the Master declined to order its production. It therefore took the Department's lawyers a while longer to realize that in December 1992 Robert F. Smith, the president and sole stockholder of Sea Sprite, had drained the firm of assets and transferred boatbuilding operations to a newly formed corporation, Continental Marine, for which Smith occupied the same roles. Continental took up business on Sea Sprite's old premises and using its methods—spraying MEK–P without a sprinklered booth. The existence of Continental came to light for the first time during the evidentiary hearing before the Master in late April 1993. Smith explained that he formed Continental because Sea Sprite had too many unsatisfied judgments against it and was being hounded by creditors. Smith estimated the firm's debts at $9 million, demonstrating that the federal government is not the only creditor he was stiffing. Continental was to continue spraying MEK–P without the required sprinklered booth until the end of April 1994; the Secretary believes that Continental has been in compliance since May 1, 1994.

Testifying at the hearing, Smith related that he had not complied with this court's order because he deemed it invalid. He apparently thought the order ineffectual because, in his view, the Department's local officials were satisfied with a change the firm made in 1988 (of which more below), but he had no answer to the rule that one must obey even an invalid judicial order until the order is stayed or reversed by a higher court. See *Pasadena City Board of Education v. Spangler*, 427 U.S. 424, 439–40, 96 S.Ct. 2697, 2706, 49 L.Ed.2d 599 (1976); *Mid–American Waste Systems, Inc. v. Gary*, 49 F.3d 286, 292 (7th Cir.1995). Smith conceded that Sea Sprite "probably" had the wherewithal to pay the $135,000 penalty in April 1989 and April 1992, but that he decided not to do so because the firm had better uses of its money.

Counsel for Sea Sprite contended that it did not need to comply with the regulation because our order is too vague and because

the Department of Labor had promised not to enforce the regulation against it. The Master thought both of these "defenses" preposterous, as do we. Our order explicitly directs Sea Sprite to "[c]omply with the Commission's final orders ... requiring abatement of the enumerated violations of the OSH Act", and those orders explicitly direct Sea Sprite to install and use a sprinklered booth. As for the idea that local agents of the Department of Labor had agreed not to enforce a regulation that the Department repeatedly had instructed Sea Sprite to obey: the best one can say is that the firm's "defense" reflects an inverted conception of the bureaucratic hierarchy.

Actually the firm's position is not inverted so much as it is invented. Witnesses for Sea Sprite testified that in 1988 the firm hired a consultant who reformulated the sprayed mixture to be less flammable. The consultant testified that he advised local OSHA employees of this alteration and informed them that, in his view, a sprinklered booth was no longer necessary. By this procedure, the consultant asserted, Sea Sprite obtained official approval to forego use of a booth. Asked for evidence that any employee of the Department of Labor had approved this proposal, Sea Sprite came up empty handed. Variances are available under 29 U.S.C. § 655(b)(6), but Sea Sprite did not apply for one and none of the procedures required by the statute was followed. By the consultant's own description, moreover, the new procedure was legally identical to the old one. For the regulation says that "[a]ll spraying operations involving the use of organic peroxides and other dual component coatings shall be conducted in approved sprinklered spray booths meeting the requirements of this section." 29 C.F.R. § 1910.107(m)(1). The reformulated spray included organic peroxides. That Sea Sprite and its consultant thought the new mixture safer than the old one is beside the point, not only under the regulation but also under orders that post dated the reformulation. Recall that Sea Sprite was cited for noncompliance *after* its supposedly "approved" modification—a citation that the firm ignored, that became administratively final in April 1989, and that we summarily enforced

in 1992 when Sea Sprite disdained its opportunity to oppose the Secretary's application. Sea Sprite might have presented its "approval" argument to the Commission in 1989 or to us in 1992. It didn't. As a defense to a citation in contempt of court, Sea Sprite's position is six years late and $135,000 short.

Sea Sprite was and is in contempt of court, and it must pay a penalty reflecting the gravity of the violation. A substantial fine for completed contempt usually is a criminal sanction, see *United Mine Workers v. Bagwell*, —— U.S. ——, 114 S.Ct. 2552, 129 L.Ed.2d 642 (1994), and Sea Sprite has not been offered the protections of the criminal process. As it happens, however, this court possesses the power to impose not only a fine for contempt of court but also the daily penalty that the Department of Labor may use in administrative proceedings. See 29 U.S.C. § 660(b): "In any contempt proceeding brought to enforce a decree of a court of appeals ... the court of appeals may assess the penalties provided by section 17, in addition to invoking any other available remedies." Section 17(d), 29 U.S.C. § 666(d), provides that "[a]ny employer who fails to correct a violation for which a citation has been issued ... within the period permitted for its correction ... may be assessed a civil penalty of not more than $7,000 for each day during which such failure or violation continues." Sea Sprite does not contend that the statutory description of the daily penalty as "civil" is impermissible under the standards of cases such as *Bagwell* and *United States v. Halper*, 490 U.S. 435, 109 S.Ct. 1892, 104 L.Ed.2d 487 (1989). True to form, Sea Sprite does not so much as mention § 17. We are not disposed to question, unbidden, the statutory designation of this penalty as "civil." Sea Sprite therefore faces under § 17 a daily penalty of $7,000 for the period between May 5, 1992, the date of this court's order, and the abatement of the violation on May 1, 1994, a total of 726 days.

Our Master recommended a penalty of $1,000 per day, aggregating $726,000. Sea Sprite contends that the daily penalty should not begin until November 8, 1993, the date of the Master's report concluding that it was in contempt of court. Unlike the common law

dog, however, the litigant in federal court does not get one free bite. The contempt began in May 1992. Sea Sprite received our order and decided to flout it; it is answerable for this decision. The contempt was deliberate and enduring. It was the continuation of a pattern predating 1986. We do not know when Sea Sprite started spraying MEK–P, but it violated the regulation from the outset. Despite formal notices and demands commencing in January 1986, Sea Sprite refused to comply. Its justifications of this conduct are ludicrous, and the formation of Continental shows that Smith sought to get away with disobedience indefinitely, shuffling the assets among corporate shells to avoid liability. Since November 1986 Sea Sprite has been subject to a conclusive (because uncontested) order to abate, yet the entire penalty for noncompliance between November 1986 and May 1989 is only $135,000. No penalty of any kind has been imposed for violations before November 1986 or between May 1989 and this court's order of May 1992. The Department of Labor has shown undue forbearance toward this scofflaw, which has answered generosity with ingratitude by failing to pay even a dime of the modest penalty levied so far. The Master found that Sea Sprite receives royalty payments from Continental and owns real property; it could have paid even after December 1992 but chose not to. Even after the Master's report of November 1993 calling Sea Sprite's justifications of its conduct "specious," the firm (through Continental) went right on spraying MEK–P without a sprinklered booth. Additional lenity is unwarranted. Having resisted discovery into its financial condition, Sea Sprite is in no position to plead poverty. We choose a penalty of $2,000 per day, for a total of $1,452,000, and would be inclined to make the number higher if we thought that the Department could collect more. For any infractions after today, the penalty will be assessed at the statutory maximum rate of $7,000 per day.

■ Seven months after learning of Continental's existence, the Secretary sought to amend his pleading to accuse Smith and Continental, in addition to Sea Sprite, of contempt of court. We referred this motion to the Master; who recommended that it be

denied, remarking that adding additional parties "would be ex post facto." If by this the Master meant that the effect of a judicial order is limited to the original litigants, the belief is incorrect. Federal injunctions and similar orders apply to the parties, their officers, their successors in interest, and other affiliated persons and entities who have actual notice. For orders issued by district courts, this principle appears in Fed.R.Civ.P. 65(d), which says that injunctions bind "the parties to the action, their officers, agents, servants, employees, and attorneys, and ... those persons in active concert or participation with them who receive actual notice of the order by personal service or otherwise." Smith and his creature Continental come within several of these categories. The rules of civil procedure do not apply to the courts of appeals, *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 406–07, 110 S.Ct. 2447, 2461, 110 L.Ed.2d 359 (1990), and Rule 65(d) lacks a counterpart in the Federal Rules of Appellate Procedure. Long ago, however, the Supreme Court held that Rule 65(d) simply restates a norm of federal equity practice and therefore is equally germane to orders enforcing decisions of administrative agencies. *Regal Knitware Co. v. NLRB*, 324 U.S. 9, 14, 65 S.Ct. 478, 481, 89 L.Ed. 661 (1945). See Charles Alan Wright & Arthur R. Miller, 11 *Federal Practice & Procedure* § 2956 (1973).

Smith, the president and sole shareholder of Sea Sprite, received actual notice of this court's order and is no less bound by it than is Sea Sprite itself. An order issued to a corporation is identical to an order issued to its officers, for incorporeal abstractions act through agents. "A command to the corporation is in effect a command to those who are officially responsible for its affairs. If they, apprised of the writ directed to the corporation, prevent compliance or fail to take appropriate action within their power for the performance of the corporate duty, they, no less than the corporation itself, are guilty of disobedience and may be punished for contempt." *Wilson v. United States*, 221 U.S. 361, 376, 31 S.Ct. 538, 542, 55 L.Ed. 771 (1911). See also *Pasco International (London) Ltd. v. Stenograph Corp.*, 637 F.2d 496, 501 (7th Cir.1980). Smith was obliged to secure Sea Sprite's compliance; instead he ensured its defiance. The formation of Continental for the admitted purpose of evading judgments against Sea Sprite was a further act of contempt. Continental, as successor in interest to Sea Sprite, acquired the business subject to this court's order. *Walling v. James V. Reuter, Inc.*, 321 U.S. 671, 674, 64 S.Ct. 826, 827, 88 L.Ed. 1001 (1944); *G. & C. Merriam Co. v. Webster Dictionary Co.*, 639 F.2d 29, 36 (1st Cir.1980); *ICC v. Rio Grande Growers Co-Op*, 564 F.2d 848 (9th Cir.1977). A sale of Sea Sprite's assets to an unrelated party would pose different, and potentially difficult, problems. *Herrlein v. Kanakis*, 526 F.2d 252 (7th Cir.1975). A shuffle between two corporations, both wholly owned by Smith, cannot avoid the injunction. By applying MEK–P outside a sprinklered booth, Continental violated both the regulation and the judgment. There is nothing remotely "ex post facto" about penalizing Smith and Continental for disobeying an order that has bound Smith personally since May 5, 1992, and that bound Continental from the instant of its formation.

Perhaps by "ex post facto" the Master meant that the Secretary waited too long before seeking to penalize Smith and Continental. The Secretary should have acted with more dispatch. Yet no statute of limitations applies to civil contempt proceedings, which means that the Secretary may commence an action at any time. *Occidental Life Insurance Co. v. EEOC*, 432 U.S. 355, 97 S.Ct. 2447, 53 L.Ed.2d 402 (1977). Anyway, the Secretary's motion to amend, filed 17 months after the July 1992 inspection revealed the contumacious conduct, falls well within both the six-year period that applies to most civil actions by the United States, 28 U.S.C. § 2415, and the new four-year period for statutory claims that lack explicit statutes of limitations, 28 U.S.C. § 1658. Whether actions by the United States are subject to principles of laches is an interesting question, compare *Costello v. United States*, 365 U.S. 265, 281, 81 S.Ct. 534, 542, 5 L.Ed.2d 551 (1961), and *United States v. Beebe*, 127 U.S. 338, 344, 8 S.Ct. 1083, 1086, 32 L.Ed. 121 (1888), with *Occidental*, 432 U.S. at 373, 97 S.Ct. at 2458, with *Martin v. Consultants &*

*Administrators, Inc.*, 966 F.2d 1078, 1090–91 (7th Cir.1992), with *id.* at 1100–01 (concurring opinion), but not one we need explore. Laches curtails litigation only if the defendant suffered prejudice during the delay. *United States v. Administrative Enterprises, Inc.*, 46 F.3d 670, 673 (7th Cir.1995). Neither Smith nor Continental was lulled into detrimental action or into discarding favorable evidence. Smith has known since 1986, if not before, that the Department of Labor wants all spraying of MEK–P to occur within sprinklered booths. The mounting of penalties during periods of noncompliance is a response to unlawful conduct, not a form of "prejudice" that permits the wrongdoer to get away scot free. *NLRB v. Ironworkers*, 466 U.S. 720, 104 S.Ct. 2081, 80 L.Ed.2d 715 (1984). The Secretary's motion to amend was therefore timely, and we grant it.

A prudential question remains. Even if no penalties for contempt of court are imposed directly on Smith and Continental, they may well be called on to pay Sea Sprite's penalty. During collection proceedings the Secretary may show that the transfer in December 1992 was a fraudulent conveyance, enabling him to reach Continental's assets. Smith testified that Sea Sprite was insolvent at the time he created Continental and transferred Sea Sprite's assets and business to the new firm—and that he did so to avoid creditors. That is a fraudulent conveyance in both objective and subjective senses. The Secretary also may be able to establish Smith's personal liability by showing that Smith operated Sea Sprite without observing the corporate forms and that respecting those forms would perpetrate an injustice. See *Sea–Land Services, Inc. v. Pepper Source*, 941 F.2d 519 (7th Cir.1991), outlining the criteria for shareholders' liability in Illinois. The Master concluded that "Sea Sprite was the alter ego of Smith", which on this record is indubitable. The Master also wrote that Smith "ordered [Sea Sprite] in December 1992 to close out its bank accounts and transferred the assets of the company to a new corporation known as Continental Marine Corporation. The comptroller of Sea Sprite, Mr. Kunz, never saw any sale or contract documents between the companies." This implies not only that Smith ran Sea Sprite without observing corporate forms but also that Sea Sprite and Continental are alter egos. Cf. *NLRB v. International Measurement and Control Co.*, 978 F.2d 334 (7th Cir.1992). All of this seems so straightforward that one wonders why the Secretary needs an additional adjudication against Smith and Continental.

Experience teaches, however, that Smith may resist collection by a combination of passive and active means. The more comprehensive the judgment against him and his creatures, the better. A formal adjudication in contempt also may set the stage for penalties beyond the collection, from Continental and Smith, of Sea Sprite's debts to the United States. Before reaching a conclusion on the Secretary's request to hold Continental and Smith in contempt of court, however, we must permit them to offer any defenses and evidence personal to themselves.. So far Sea Sprite has been the only formal party. Although corporate officers and successors must obey an injunction against the corporation, any person charged with contempt is entitled to his own opportunity to defend. Unless Continental and Smith have evidence that was not offered in Sea Sprite's defense, the proceeding can be conducted with dispatch, but they are entitled to the opportunity. We therefore ask the Master to reopen the record and to offer Continental and Smith an opportunity to present any additional arguments and evidence bearing on the question whether they are in contempt of court. Decision in this case has too long been deferred. The Master should schedule the hearing within a month of this opinion and make his recommendations within a month of the hearing. An accelerated briefing schedule will follow.

To sum up: Sea Sprite is in contempt of court and must pay a penalty of $1,452,000 plus interest from today. We will assess $7,000 per day for any future noncompliance. Sea Sprite continues to owe the original $135,000, on which interest has been accumulating for years. Continental and Smith are added to the contempt proceeding as respondents and will have an opportunity to present arguments and evidence at a hearing to be held before the Master. Our conclusions

about Sea Sprite are not subject to reexamination in these additional proceedings; Sea Sprite had a full opportunity to defend, the record concerning it is closed, and the penalty we have announced may be collected immediately. But everything we have said about Smith and Continental is provisional, reflecting the current record but not necessarily presaging the conclusions to be drawn from an enlarged record.