# In the
# United States Court of Appeals
## For the Seventh Circuit

No. 08-2306

THE NATIONAL SPIRITUAL ASSEMBLY OF THE
BAHÁ'ÍS OF THE UNITED STATES OF AMERICA
UNDER THE HEREDITARY GUARDIANSHIP, INC.,

*Plaintiff,*

*v.*

NATIONAL SPIRITUAL ASSEMBLY OF THE BAHÁ'ÍS
OF THE UNITED STATES OF AMERICA, INC.,

*Defendant-Appellant,*

*v.*

FRANKLIN D. SCHLATTER, JOEL B. MARANGELLA,
PROVISIONAL NATIONAL BAHÁ'Í COUNCIL OF THE
UNITED STATES, et al.,

*Respondents-Appellees.*

————————

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 1:64-cv-01878—**Amy J. St. Eve**, *Judge.*

————————

ARGUED FEBRUARY 20, 2009—DECIDED NOVEMBER 23, 2010

————————

Before BAUER, MANION, and SYKES, *Circuit Judges*.

SYKES, *Circuit Judge*. This appeal is from a civil-contempt proceeding alleging violations of an injunction entered more than four decades ago. The case is complicated not just by the passage of time but also because it arises in the context of a religious schism, and the individuals and groups against whom contempt sanctions are sought were not parties to the original litigation. The underlying suit was a trademark and property dispute between the American Bahá'í church—formally known as the National Spiritual Assembly of the Bahá'ís of the United States of America, Inc. ("National Spiritual Assembly")—and a dissident group incorporated in 1964 under the like-sounding name of the National Spiritual Assembly of the Bahá'ís of the United States of America Under the Hereditary Guardianship, Inc. ("Hereditary Guardianship"). In 1966 a district-court judge enjoined the Hereditary Guardianship from using the trademarked names and symbols of the National Spiritual Assembly. Within months the Hereditary Guardianship dissolved, and the dissenting faithful thereafter disagreed among themselves over issues of spiritual leadership and doctrine. This disagreement eventually produced a second schism. Over time the former followers of the Hereditary Guardianship established several new religious groups and a publishing firm, all operating in varying ways in the name of the Bahá'í faith.

Forty years later, the National Spiritual Assembly returned to the district court and asked for contempt sanctions against several of these groups and their principals for allegedly violating the terms of the 1966 injunction.

This required proof that the alleged contemnors—all nonparties to the original lawsuit—were in privity with the Hereditary Guardianship and therefore bound by the injunction. In a comprehensive opinion, the district court rejected the privity claim and on this basis denied the contempt motion. In reaching this conclusion, the judge expressly declined to follow the approach to the privity question adopted by the First Circuit in *G. & C. Merriam Co. v. Webster Dictionary Co.*, 639 F.2d 29 (1st Cir. 1980). The judge said that *Merriam* was in "silent tension" with Judge Learned Hand's venerable opinion in *Alemite Manufacturing Corp. v. Staff*, 42 F.2d 832 (2d Cir. 1930).

We think these two important opinions can be reconciled. The common-law rule expounded in *Alemite*—essentially codified in Rule 65(d) of the Federal Rules of Civil Procedure—holds that an injunction is binding on the parties to the proceeding; their officers, agents, and employees (acting in that capacity); and nonparties with notice who are either "legally identified" with a party or who aid and abet a party's violation of the injunction. The "legal identity" component of this rule often operates to bind a party's successors and assigns, and sometimes other nonparties as well, but only when doing so is consistent with due process. As such, the "legal identity" justification for binding nonparties is limited to those who have notice of the injunction and are so closely identified in interest with the enjoined party that it is reasonable to conclude that their rights and interests were adjudicated in the original proceeding. In *Merriam* the First Circuit held that a former employee of an enjoined corporation had such a key role in the company and in the underlying litigation

that he could be "legally identified" with the enjoined corporation and therefore held in contempt for using a newly formed company to circumvent the injunction. 639 F.2d at 39-40. This is a specific application of the "legal identity" category of nonparty contempt identified in *Alemite*; we do not read *Merriam* as inconsistent with Judge Hand's formulation.

Although the district court should have applied *Merriam*, the judge's findings are thorough enough to permit us to resolve the privity question without a remand. The respondent nonparty religious groups and their principals are not sufficiently identified in interest with the Hereditary Guardianship to permit a conclusion that they had their day in court back in 1966. We affirm.

## I. Background

### A. The Bahá'í Schism and the 1966 Injunction

The Bahá'í faith originated in Persia in 1844 with the teachings of the Báb, who foretold that God would soon reveal a prophet to the world. In 1863 Bahá'u'lláh, one of the Báb's followers, announced that he was this prophet and began several decades of spiritual teaching and writing. With Bahá'u'lláh's death in 1892, spiritual leadership passed to his eldest son, Abdu'l-Bahá. Abdu'l-Bahá died in 1921, and his eldest grandson, Shoghi Effendi, then led the faith as its Guardian. Effendi died unexpectedly in 1957 without having clearly designated a successor. Spiritual authority passed temporarily to the Hands of the Cause of God, a group of 27 Effendi-appointed spiritual leaders who stewarded the religion until 1963. At that

point the Hands transferred supreme authority of the Bahá'í faith to the newly established Universal House of Justice in Haifa, Israel.

The National Spiritual Assembly, whose predecessor organization was formed in the United States in 1909, recognizes and accepts this described line of succession. Charles Mason Remey did not. Remey, one of Effendi's appointed Hands, proclaimed in 1960 that Effendi's spiritual authority had passed to him as the Second Guardian of the Faith. The other Hands rejected this claim, believing that Effendi was the first and last Guardian of the Faith, and they expelled Remey from their ranks. The National Spiritual Assembly likewise views Remey as a schismatic figure.

In 1962 Remey instructed his followers to establish the National Spiritual Assembly of the Bahá'ís of the United States Under the Hereditary Guardianship. The Hereditary Guardianship was incorporated in New Mexico in 1964, and it served as the coordinating body for an affiliation of individuals, groups, and local spiritual assemblies in the United States dedicated to Remey's Guardianship. The Hereditary Guardianship itself was comprised of nine "Members" who essentially acted as a board of directors and, at least initially, followed Remey's declarations and directives.[1]

In the year of its incorporation, the Hereditary Guardianship commenced a civil action against the National Spiri-

---

[1] For the sake of simplicity, we refer to them as "board members."

tual Assembly in federal court in the Northern District of Illinois. The Hereditary Guardianship claimed entitlement to the majestic Bahá'í House of Worship in Wilmette, Illinois, pictured here:



and also sued for all other properties and funds in the National Spiritual Assembly's possession. The National Spiritual Assembly in turn asserted counterclaims against the Hereditary Guardianship for trademark infringement and unfair competition, among other causes of action.

In a decision issued on June 28, 1966, Judge Richard Austin sided with the National Spiritual Assembly. Among other factual findings, Judge Austin found that

> Shoghi Effendi was the only Guardian of the Baha'i Faith, and there is no Guardian at the present time and has been none since 1957. The procedures followed by the Hands of the Cause and the succession of authority from Shoghi Effendi to The Universal House of Justice were in full accordance with the controlling documents and sacred writings and teachings of the Faith.

*Nat'l Spiritual Assembly v. Nat'l Spiritual Assembly*, No. 64 C 1878, 1966 WL 7641, at *2 (N.D. Ill. 1966). The judge also found that the National Spiritual Assembly "is the highest authority of the Baha'i Faith in the continental United States, and has been recognized and authorized as such by The Universal House of Justice and its predecessor supreme Baha'i Faith authorities." *Id.* at *3. On the basis of these and other findings of fact, Judge Austin concluded that "[t]here is only one Baha'i Faith," and that the National Spiritual Assembly is the "highest authority for the Faith in [the] continental United States and is entitled to exclusive use of the marks and symbols of the Faith." *Id.* at *11. The judge went on to hold that the National Spiritual Assembly owned valid trademarks in several specific Bahá'í symbols, names, and phrases—including a trademark in the word "Bahá'í"—all of which the Hereditary Guardianship had infringed. Judge Austin then entered the following injunction:

IT IS ORDERED, ADJUDGED AND DECREED that the
counter-defendant, [the Hereditary Guardianship], its
officers, agents, servants, employees, attorneys, and all
persons in active concert or participation with them,
including [affiliated local groups], and individuals, or
any of them, be and they are hereby enjoined from
using in their activities the designations "National
Spiritual Assembly of the Baha'is of the United States
of America Under the Hereditary Guardianship, Inc.,"
"Baha'i News Bureau," "Baha'i Round Robin,"
"Baha'i," trademark representations of the Baha'i
House of Worship, the Arabic design "The Greatest
Name," and any other designation which by colorable
imitation or otherwise is likely to be mistaken for or
confused with [the National Spiritual Assembly's]
name or marks as indicated above or is likely to create
the erroneous impression that [the Hereditary Guard-
ianship's] religious activities, publications or doctrines
originate with [the National Spiritual Assembly], and
from otherwise competing unfairly with [the National
Spiritual Assembly] or infringing [the National Spiri-
tual Assembly's] rights.

*Id.* at *12.

Remey acquiesced in the injunction, and he forbade the
Hereditary Guardianship and its followers from pursuing
reconsideration or appeal "regardless of consequences." A
few months later, in December 1966, the Hereditary
Guardianship ceased all activities and dissolved. Remey
eventually reconstituted his church and changed his title to
the "First Guardian of the Abha Faith."

**B. The Current Dispute**

In 2006 the National Spiritual Assembly returned to court seeking contempt sanctions against five religious organizations and individuals—all remnants of the Hereditary Guardianship but nonparties to the original litigation—for allegedly violating the 1966 injunction. The National Spiritual Assembly contended that the alleged contemnors were in privity with the Hereditary Guardianship and therefore bound by the injunction. The named respondents can be classified into two groups. The first includes Joel Marangella, Frank Schlatter, and the Provisional National Bahá'í Council of the United States, Inc. The second includes the Second International Bahá'í Council d/b/a Bahá'ís Under the Provisions of the Covenant ("Second International Council") and Bahá'í Publishers Under the Provisions of the Covenant ("Bahá'í Publishers"). We offer a brief description of each.

### 1. The First Group of Alleged Nonparty Contemnors

Joel Marangella was the president of a council that functioned essentially as a liaison between Remey and the Hereditary Guardianship. While not a board member of the Hereditary Guardianship, Marangella was actively involved in the organization and participated in some aspects of the underlying litigation, basically as a trusted assistant to Remey. A few years after the Hereditary Guardianship dissolved, Marangella split with Remey and forced a second schism. He proclaimed himself to be Remey's appointed Third Guardian of the Bahá'í Faith. Remey disputed Marangella's

claim; he had already announced that upon his death, Donald Harvey was to succeed him as the next Guardian. Remey and Marangella thus parted ways. Starting in 1970, Marangella organized a succession of religious assemblies dedicated to his Guardianship. The first, the National Bureau of the Orthodox Bahá'í Faith ("National Bureau"), was established in New York as an unincorporated body. In 1972 Marangella moved the National Bureau to New Mexico and later changed its name to the Mother Bahá'í Council, which was incorporated under the laws of New Mexico in 1978. In 2000 the Mother Bahá'í Council changed its name to the Provisional National Bahá'í Council of the United States, Inc. ("Provisional National Council").

Franklin Schlatter was a founding board member and officer of the Hereditary Guardianship. He appears to have been involved with the Hereditary Guardianship's activities to a considerable degree and was part of the board that voted to sue the National Spiritual Assembly. When the Remey-Marangella schism occurred, Schlatter followed Marangella and served as secretary of the Provisional National Council (and its predecessors) from 1978 through 2001. In 1997 Marangella appointed Schlatter as a Hand of the Cause of God to assist and act on his behalf.

The Provisional National Council governs all believers within the United States who recognize Marangella as the Third Guardian, much like Hereditary Guardianship governed those who recognized Remey as the Second Guardian. Marangella personally appoints all Provisional National Council board members and

reviews and approves all decisions relating to the organization's activities and affairs.

### 2. The Second Group of Alleged Nonparty Contemnors

The Second International Council and Bahá'í Publishers were created by Dr. Leland Jensen, who signed the incorporation papers for the Hereditary Guardianship and served as a board member from April 1963 to May 1964. In 1964, however, Jensen lost reelection to the board, and he thereafter disassociated himself from any formal governance role in the Hereditary Guardianship. Accordingly, he was not a board member when the Hereditary Guardianship sued the National Spiritual Assembly, nor did he have any role in the litigation. Dr. Jensen continued to follow Remey's Guardianship, however, and when he and his wife moved to Missoula, Montana, sometime later that year, they established a small community of believers there.

In 1969 Dr. Jensen formed the Bahá'í Publishers as a publishing trust and incorporated it in Montana in 1987. Bahá'í Publishers publishes books and pamphlets on Dr. Jensen's interpretation of the beliefs of the Bahá'í faith "under the Provisions of the Covenant." Dr. Jensen also helped establish the Second International Council in 1991, which was incorporated two years later. The Second International Council handles administrative responsibilities for believers in the Bahá'í faith "under the Provisions of the Covenant" and describes its "main responsibility" as "giv[ing] guidance to anybody who requests it." Jensen died in 1996.

**C. The District Court Rejects the Privity Claim**

Judge Austin had long since died by the time the Na-
tional Spiritual Assembly returned to court in 2006, so the
contempt motion was assigned to Judge Amy St. Eve. She
authorized limited discovery and then held an extensive
evidentiary hearing on the question of whether the alleged
nonparty contemnors were in privity with the Hereditary
Guardianship and thus bound by the injunction. She
concluded they were not. In reaching this decision, Judge
St. Eve declined to follow the First Circuit's decision in
*Merriam*, 639 F.2d 29, on which the National Spiritual
Assembly had substantially relied in support of its privity
claim. But she made detailed findings about the relation-
ship of each of the alleged contemnors to the Hereditary
Guardianship and/or Remey, and based on those findings,
concluded that they could not be bound. This appeal
followed.

## II. Analysis

The National Spiritual Assembly argues that the district
court committed legal error by rejecting the First Circuit's
holding in *Merriam* that a key officer or employee of an
enjoined but later dissolved corporation can be "legally
identified" with the corporation and therefore personally
bound by the injunction. As a more general matter, the
National Spiritual Assembly challenges the district court's
conclusion that the five nonparty alleged contemnors were
not in privity with the Hereditary Guardianship and
therefore are not bound by the 1966 injunction. We agree
with the first of these arguments. *Merriam* is not, as the

district court thought, an overbroad statement of the principles on which a nonparty may be considered bound by an injunction. But it does not follow that the district court's no-privity conclusion was in error. The facts here do not support a finding of privity even when *Merriam* is considered.

## A.  The Effect of *Presbyterian Church*

Before proceeding, a few words about the substance of the underlying injunction and its relationship to the civil-procedural questions at issue in this case. The injunction was entered in 1966, before the Supreme Court's decision in *Presbyterian Church in the United States v. Mary Elizabeth Blue Hull Memorial Presbyterian Church*, 393 U.S. 440 (1969), but after *Kedroff v. St. Nicholas Cathedral of Russian Orthodox Church in North America*, 344 U.S. 94 (1952). *Kedroff* constitutionalized the general common-law principle announced in *Watson v. Jones*, 80 U.S. (13 Wall.) 679 (1871), that civil authorities may not make judgments about religious controversies when deciding church property disputes. *Kedroff*, 344 U.S. at 116 (The church-autonomy principle recognized in *Watson* "must now be said to have federal constitutional protection as a part of the free exercise of religion against state interference.").

Building on *Kedroff*, the Supreme Court held in *Presbyterian Church* that "the First Amendment severely circumscribes the role that civil courts may play in resolving church property disputes." 393 U.S. at 449. The Court acknowledged that "[c]ivil courts do not inhibit [the] free

exercise of religion merely by opening their doors to disputes involving church property." *Id.* But "First Amendment values are plainly jeopardized when church property litigation is made to turn on the resolution by civil courts of controversies over religious doctrine and practice." *Id.* The "[First] Amendment therefore commands civil courts to decide church property disputes without resolving underlying controversies over religious doctrine." *Id.; see also Serbian E. Orthodox Diocese for the U.S. of Am. & Can. v. Milivojevich*, 426 U.S. 696, 713 (1976) (noting "the general rule that religious controversies are not the proper subject of civil court inquiry"). Civil courts may decide church property claims based on "neutral principles of law, developed for use in all property disputes," but have no authority to resolve religious disputes.[2]   *Presbyterian Church*, 393 U.S. at 449.

Considered in light of these First Amendment limitations on the court's authority, certain aspects of the 1966 injunction are troubling. The decree declares that "there is only one Baha'i Faith," that Shoghi Effendi was its last Guardian and none has come since, and the National Spiritual Assembly was its representative and "highest authority" in the United States and was "entitled to exclusive use of the

---

[2] For different views on the so-called "hands-off" doctrine in disputes over religious property, *see* Richard W. Garnett, *A Hands-Off Approach to Religious Doctrine: What Are We Talking About?*, 84 NOTRE DAME L. REV. 837 (2009); Kent Greenawalt, *Hands Off! Civil Court Involvement in Conflicts Over Religious Property*, 98 COLUM. L. REV. 1843 (1998); Samuel J. Levine, *Rethinking the Supreme Court's Hands-Off Approach to Questions of Religious Practice and Belief*, 25 FORDHAM URB. L.J. 85 (1997).

marks and symbols of the Faith," including the exclusive use of the word "Bahá'í." Declarations of this sort push the boundaries of the court's authority under *Kedroff* and *Presbyterian Church.* In church property disputes (trademark suits obviously qualify), the First Amendment limits the sphere in which civil courts may operate. When a district judge takes sides in a religious schism, purports to decide matters of spiritual succession, and excludes dissenters from using the name, symbols, and marks of the faith (as distinct from the name and marks of a church), the First Amendment line appears to have been crossed.

But a contempt proceeding is ordinarily not the proper place for collateral attacks on the underlying injunction. *See Pasadena City Bd. of Educ. v. Spangler*, 427 U.S. 424, 439-40 (1976); *Walker v. City of Birmingham*, 388 U.S. 307 (1967); *Reich v. Sea Sprite Boat Co.*, 50 F.3d 413, 415 (7th Cir. 1995); *see also* 11A CHARLES ALAN WRIGHT ET AL., FEDERAL PRACTICE AND PROCEDURE § 2960, at 391 (2d ed. 1995) ("[T]he general principle appears to be that obedience to a decree is required, even though the issuing court has based its decision on an incorrect view of the law, unless there was no opportunity for effective review of the decree."). We do not have the substance of the 44-year-old decree before us. Still, resolving the procedural questions at issue in this case requires some sensitivity to the constitutional concerns inherent in church property claims. *Presbyterian Church* is in the background and circumscribes the inquiry. Applying neutral privity principles is permissible; pronouncing on matters of religious succession is not.

**B. Standard of Review**

We review the district court's denial of contempt sanctions for abuse of discretion. *Autotech Techs. LP v. Integral Research & Dev. Corp.*, 499 F.3d 737, 751 (7th Cir. 2007); *Stotler & Co. v. Able*, 870 F.2d 1158 (7th Cir. 1989). A court abuses its discretion when it bases its decision on a legal error or on clearly erroneous factual findings. *United States v. Silva*, 140 F.3d 1098, 1101 n.4 (7th Cir. 1998); *In re L & S Indus., Inc.*, 989 F.2d 929, 932 (7th Cir. 1993) (similar standard of review for district court's determination of existence of privity); *see Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 401 (1990) (noting abuse-of-discretion standard of review is equivalent to clear-error standard of review when reviewing a district court's factual findings). Factual findings are not clearly erroneous unless "'the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.'" *Anderson v. City of Bessemer City*, 470 U.S. 564, 573 (1985) (quoting *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 394-95 (1948)).

As the proponent of the contempt motion, the National Spiritual Assembly had the following burden:

> To prevail on a request for a contempt finding, the moving party must establish by clear and convincing evidence that (1) a court order sets forth an unambiguous command; (2) the alleged contemnor violated that command; (3) the violation was significant, meaning the alleged contemnor did not substantially comply with the order; and (4) the alleged contemnor failed to make a reasonable and diligent effort to comply.

*S.E.C. v. Hyatt,* 621 F.3d 687, 692 (7th Cir. 2010). In addition, the National Spiritual Assembly had the burden of establishing that the alleged contemnors, nonparties to the 1966 injunction, are nonetheless bound by it. *See Levin v. Tiber Holding Corp.*, 277 F.3d 243, 250-51 (2d Cir. 2002) (applying the clear-and-convincing standard to the question of a nonparty's liability for contempt).

### C.  Injunctions and Nonparties

This appeal raises the question of the proper reach of an injunction—more specifically, the extent to which an injunction binds persons who are not parties to the action in which it is entered. " 'It is a principle of general application in Anglo-American jurisprudence that one is not bound by a judgment *in personam* in a litigation in which he is not designated as a party or to which he has not been made a party by service of process.' " *Taylor v. Sturgell*, 553 U.S. 880, 884 (2008) (quoting *Hansberry v. Lee*, 311 U.S. 32, 40 (1940)); *see also Richards v. Jefferson County*, 517 U.S. 793, 798 (1996); *Martin v. Wilks*, 490 U.S. 755, 761 (1989); *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 110 (1969). This principle is based on the " 'deep-rooted historic tradition that everyone should have his own day in court.' " *Taylor*, 553 U.S. at 892-93 (quoting *Richards*, 517 U.S. at 798). It limits the extent to which a judgment is given preclusive effect in a subsequent suit, *see id.* at 891-95, and (more pertinent here) the extent to which an injunction may be enforced against nonparties, *see Zenith Radio*, 395 U.S. at 110-11; *see also Lake Shore Asset Mgmt. Ltd. v. Commodity Futures Trading Comm'n*, 511 F.3d 762, 766-67 (7th Cir. 2007).

There are some well-established exceptions to the general principle that an injunction binds only the parties. Rule 65(d) of the Federal Rules of Civil Procedure, which governs injunctions and temporary restraining orders, codifies both the general principle and its exceptions:

> **(2)** *Persons Bound.* The order binds only the following who receive actual notice of it by personal service or otherwise:
>
>> **(A)** the parties;
>>
>> **(B)** the parties' officers, agents, servants, employees, and attorneys; and
>>
>> **(C)** other persons who are in active concert or participation with anyone described in Rule 65(d)(2)(A) or (B).

FED. R. CIV. P. 65(d)(2).[3]

By its terms, Rule 65(d) makes injunctions binding on the parties to the underlying action *and* their "officers, agents, servants, employees, and attorneys," even if those "officers, agents," etc., are not named as parties to the litigation. FED. R. CIV. P. 65(d)(2)(B). This is based on the idea that "[a]n order issued to a corporation is identical to an order issued to its officers, for incorporeal abstractions act through agents." *Reich*, 50 F.3d at 417; *see also Wilson v.*

---

[3] We quote from the current version of Rule 65(d)(2), which was amended in 2007. The amended rule contains "no substantive difference" from its predecessor. *Lake Shore Asset Mgmt. Ltd. v. Commodity Futures Trading Comm'n*, 511 F.3d 762, 767 (7th Cir. 2007).

*United States*, 221 U.S. 361, 376 (1911) ("A command to the corporation is in effect a command to those who are officially responsible for the conduct of its affairs."); *Additive Controls & Measurement Sys., Inc. v. Flowdata, Inc.*, 154 F.3d 1345, 1351 (Fed. Cir. 1998) ("Rule 65(d) specifically names 'officers' of a defendant as among those who are bound by an injunction, and there is a substantial body of case law in support of that proposition."). As such, officers, employees, and other agents of an enjoined party must obey the injunction—even though they are not named parties—when they act in their official capacities. *See New York ex rel. Vacco v. Operation Rescue Nat'l*, 80 F.3d 64, 70 (2d Cir. 1996) ("An injunction issued against a corporation or association binds the agents of that organization to the extent they are acting on behalf of the organization. . . . Generally, persons who cease to act in one of the designated capacities are no longer bound by the decree." (citation omitted)).

This aspect of the rule is not implicated in this case. Although the individual defendants might have qualified as "officers" or "agents" of the Hereditary Guardianship in June of 1966 when the injunction was entered, after the organization was dissolved in December of that year, they obviously no longer held that status. They cannot, in other words, act in their official capacities to cause the Hereditary Guardianship to violate the injunction.

As to other nonparties who might properly be bound by an injunction, the Supreme Court has explained that Rule 65(d)(2) is

derived from the commonlaw doctrine that a decree of injunction not only binds the parties defendant but also those identified with them in interest, in "privity" with them, represented by them or subject to their control. In essence it is that defendants may not nullify a decree by carrying out prohibited acts through aiders and abettors, although they were not parties to the original proceeding.

*Regal Knitwear Co. v. N.L.R.B.*, 324 U.S. 9, 14 (1945). Broadly speaking, both the rule and the common-law doctrine contemplate two categories of nonparties potentially bound by an injunction. One includes nonparties acting in concert with a bound party; many cases hold that a nonparty may be held in contempt if he aids or abets an enjoined party in violating an injunction. *Id.*; *Chase Nat'l Bank v. City of Norwalk, Ohio*, 291 U.S. 431, 436 (1934); *S.E.C. v. Homa*, 514 F.3d 661, 673-77 (7th Cir. 2008); *Rockwell Graphic Sys., Inc. v. DEV Indus., Inc.*, 91 F.3d 914, 919 (7th Cir. 1996). This principle is codified in subsection (2)(C) of the rule, which provides that nonparties "who are in active concert or participation with" a bound party are themselves bound and may be liable for aiding and abetting the party's contempt. *See* FED. R. CIV. P. 65(d)(2)(C). This category of nonparty contempt liability is also not at issue here.

The other category is captured under the general rubric of "privity." It is generally accepted that an injunction may be enforced against a nonparty in "privity" with an enjoined party. *E.g.*, *Golden State Bottling Co. v. N.L.R.B.*, 414 U.S. 168, 179-80 (1973); *Regal Knitwear*, 324 U.S. at 14;

*Rockwell Graphic Sys.*, 91 F.3d at 919. This concept can be hard to pin down; the use of the term "privity" has expanded over time. *See Taylor*, 553 U.S. at 894 n.8 ("The term 'privity' . . . has also come to be used more broadly, as a way to express the conclusion that nonparty preclusion is appropriate on any ground."); *Richards*, 517 U.S. at 798 ("[T]he term 'privity' is now used to describe various relationships between litigants that would not have come within the traditional definition of that term."). In this context, "privity" has come to be "seen as a descriptive term for designating those with a sufficiently close identity of interests" to justify application of nonparty claim preclusion, *Tice v. Am. Airlines, Inc.*, 162 F.3d 966, 971 (7th Cir. 1998) (internal quotation marks omitted), or the enforcement of an injunction against a nonparty, *see Regal Knitwear*, 324 U.S. at 14.

The concept of privity, however—both in preclusion doctrine *and* in the law of injunctions—is ultimately bounded by due process, which starts from a "presumption that each person has a right to her day in court." Martin H. Redish & William J. Katt, Taylor v. Sturgell, *Procedural Due Process, and the Day-in-Court Ideal: Resolving the Virtual Representation Dilemma*, 84 NOTRE DAME L. REV. 1877, 1881 (2009); *see also Richards*, 517 U.S. at 798 ("[T]here are clearly constitutional limits on the 'privity' exception . . . ."); *Regal Knitwear*, 324 U.S. at 13 ("The courts, nevertheless, may not grant an enforcement order or injunction so broad as to make punishable the conduct of persons who acted independently and whose rights have not been adjudged according to law."); *Tice*, 162 F.3d at 971 (cautioning against too relaxed an approach to privity because

"serious due process problems would arise if the earlier nonparty were barred from her own day in court").

Both preclusion doctrine and Rule 65(d)(2) are concerned with the scope and effect of a judgment, and "[i]n no area of procedure has this [own-day-in-court] ideal traditionally played a more important role than the field of judgments." Redish & Katt, *supra*, at 1877. When privity is invoked as a basis for binding a nonparty to an injunction, it is "restricted to persons so identified in interest with those named in the decree that it would be reasonable to conclude that their rights and interests have been represented and adjudicated in the original injunction proceeding." 11A CHARLES ALAN WRIGHT ET AL., FEDERAL PRACTICE AND PROCEDURE § 2956, at 340-41 (2d ed. 1995).

The caselaw suggests that when it comes to injunctions, the concept of nonparty privity has at least two subcategories. One line of cases holds that an injunction will bind nonparty successors in interest to an enjoined party. *E.g.*, *Golden State Bottling Co.*, 414 U.S. 168; *Regal Knitwear*, 324 U.S. at 14-15; *Walling v. James V. Reuter, Inc.*, 321 U.S. 671 (1944); *Reich*, 50 F.3d 413; *Panther Pumps & Equip. Co. v. Hydrocraft, Inc.*, 566 F.2d 8 (7th Cir. 1977); *see also Operation Rescue Nat'l*, 80 F.3d at 70 ("[A party may not] circumvent a valid court order merely by making superficial changes in the organization's name or form . . . ."). Another line of cases holds that a nonparty may be bound by an injunction if the nonparty is otherwise "legally identified" with the enjoined party. *See, e.g.*, *Merriam*, 639 F.2d at 37-40; *see also Flowdata*, 154 F.3d at 1352 (using "legal identification" test and favorably citing *Merriam*).

The main dispute in this case centers on the First Circuit's decision in *Merriam*, and specifically whether its articulation of the "legal identity" basis for privity is doctrinally sound. The question arises here because the district court thought *Merriam* was inconsistent with the Second Circuit's famous articulation in *Alemite* of the principles on which nonparties may be held in contempt and the related limits on the court's adjudicative power. In *Alemite* the underlying suit involved four brothers alleged to be partners in a business that was infringing the plaintiff's patent. Two of the brothers were never served, and the case proceeded to trial against the remaining two, John and Joseph Staff. Joseph was dismissed as a defendant after John testified that the business belonged solely to him and he merely employed Joseph as a salesman. The court then enjoined John Staff and "his agents, employees, associates and confederates" from infringing the plaintiff's patent. Sometime later Joseph left his brother's employ, "set up in business for himself, and was proved to have infringed the patent." *Alemite*, 42 F.2d at 832. The plaintiff initiated contempt proceedings against Joseph. Though he was no longer John's employee, and John himself was not involved in Joseph's infringement of the patent, the district court found Joseph—a nonparty to the injunction action—in contempt. *Id.*

The Second Circuit reversed. In a decision by Judge Hand, the court explained the background legal principles as follows:

> [N]o court can make a decree which will bind any one but a party; a court of equity is as much so limited as a

court of law; it cannot lawfully enjoin the world at large, no matter how broadly it words its decree. If it assumes to do so, the decree is pro tanto brutum fulmen, and the persons enjoined are free to ignore it. It is not vested with sovereign powers to declare conduct unlawful; its jurisdiction is limited to those over whom it gets personal service, and who therefore can have their day in court. Thus, the only occasion when a person not a party may be punished, is when he has helped to bring about, not merely what the decree has forbidden, because it may have gone too far, but what it has power to forbid, an act of a party. This means that the respondent must either abet the defendant, or must be legally identified with him.

*Id.* at 832-33. Joseph Staff was not himself a party to the injunction and was no longer employed by John, the enjoined party; he had not aided or abetted a violation of the injunction by John, the bound party. Accordingly, the court held that Joseph could not be found in contempt. *Id.* at 833. "The District Court," the Second Circuit explained, "had no more power in the case at bar to punish the respondent than a third party who had never heard of the suit." *Id.*

In *Merriam* the First Circuit invoked *Alemite* in another case involving two brothers, but with a different result: *Merriam* held that a "key employee" of a corporation could be personally bound by an injunction against the corporation even after he ceased being an agent of the company. 639 F.2d at 39. Brothers John and George Hoskins opened a small reference-book marketing company known as the

Webster Dictionary Company in 1975; John was its president and sole shareholder, and George was his general sales manager. At its peak the company had six employees; it was not in business very long. The big dictionary firm G. & C. Merriam Co. owned the rights to the well-known "Webster's" line of dictionaries, and in late 1975 it sued Webster Dictionary for trademark infringement, seeking damages and injunctive relief. In March 1977 Webster Dictionary advised the court that it was insolvent, was discharging its attorneys, and would consent to entry of an "appropriate judgment" against it. In October of that year, the district court held that Webster Dictionary had defaulted and entered a permanent injunction against it and John Hoskins barring them from using various Merriam tradenames and marks. Webster Dictionary went out of business and John Hoskins exited the reference-book market.

George Hoskins did not. In 1976, still employed by Webster Dictionary, George incorporated Webster Publishing Company and two related corporations, the business of which bore "a striking resemblance to that of Webster Dictionary Company." *Id.* at 34. After Webster Dictionary ceased operations, George Hoskins, through Webster Publishing, continued to use Merriam's tradenames and marks in much the same way as Webster Dictionary had. The district court held that George Hoskins and Webster Publishing were bound by the injunction against Webster Dictionary and found them in contempt.

The First Circuit reversed based on a lack of clarity in the district court's order and remanded with a detailed

explanation of the possible legal grounds for holding
George Hoskins and Webster Publishing bound by the
injunction though they were not parties to the underlying
litigation. The court began with a discussion of *Alemite*,
summarizing the holding in this way: "To hold a non-
party bound by an injunction it is thus essential to prove
either that the nonparty participated in the contumacious
act of a party or that the nonparty was subject to the
injunction because [he is] legally identified with a party."
*Id.* at 35. Because George Hoskins had not participated in
an act of contempt by John, the court recognized that he
could not be held in contempt as an aider and abettor. *Id.*
The court noted that an enjoined party's "successors and
assigns" might be "legally identified" with the bound party
and thus obligated to obey the injunction; this justification
for nonparty contempt was also unavailable because
George Hoskins and Webster Publishing were not the
successors or assigns of John or Webster Dictionary. In this
regard, the court observed that "[i]t is not enough to prove
that the first entity went out of existence and . . . the second
entity entered into the enjoined type of business activity,
knowing about the injunction but without having acquired
the business, or a relevant part of it, from the first entity."
*Id.* at 36.

But the court went on to conclude that a person could be
"legally identified" with an enjoined corporation and thus
personally bound by the injunction if he was a "key
employee" of the corporation, had a significant role in the
underlying litigation, and was closely identified with the
bound party in other relevant respects. *Id.* at 37. Impor-

tantly, the court explained that the nonparty's status as a "key employee" of the enjoined corporation is not sufficient by itself to personally bind him to the injunction:

> [T]hat George Hoskins was a "key employee" of Webster Dictionary Company as well as "the principal" of [Webster Publishing] . . . is insufficient to support the district court's conclusion that George Hoskins was bound by the injunction. The central reason that one who is not a party to the action in which the injunction was issued cannot be bound by it is that he has not had his day in court with respect to the validity of the injunction. Cf. Alemite, *supra*. Absent an opportunity to contest liability, his knowledge of the injunction is not sufficient to bind him as an individual, *id.*, as distinguished from prohibiting him from acting in the forbidden way on behalf of the enjoined party. Thus, the relevant inquiry is not merely whether (in addition to having knowledge of the injunction) George Hoskins was a "key employee" of Webster Dictionary Company but whether he had such a key role in the corporation's participation in the injunction proceedings that it can be fairly said that he has had his day in court in relation to the validity of the injunction.

*Id.* The court issued these remand instructions to the district court:

> The evidence raises a fact issue as to whether this is a case of the same person continuing to do essentially the same thing with the same high degree of practical control, discretion and responsibility,

before and after the injunction, with knowledge of the injunction, and after participating in the enjoined firm's corporate decisionmaking regarding its position in the injunction proceedings. If it is found that George Hoskins was legally identified with Webster Dictionary Company in this way, then he is bound by the injunction and the appellant corporations founded by him are also subject to it.

*Id.* at 38.

The upshot of *Merriam* is that a key employee, officer, director, shareholder, or other central figure in an enjoined corporation can be personally bound by the injunction even after the company has dissolved, *provided* he had a controlling role in the injunction proceedings and is otherwise so "closely identified" with the enjoined corporation that it may reasonably be said that he had his day in court when the injunction was issued.[4] These important qualifiers keep *Merriam* within the limits of due process.

---

[4] Understood in this way, *Merriam* corresponds to one of the categories of nonparty preclusion listed in *Taylor*, which might be described in shorthand as "control person" preclusion. *Taylor v. Sturgell*, 553 U.S. 880, 895 (2008) ("[A] nonparty is bound by a judgment if she assumed control over the litigation in which that judgment was rendered." (internal quotation marks omitted)); *see also Montana v. United States*, 440 U.S. 147, 153-54 (1979); *Schnell v. Peter Eckrich & Sons, Inc.*, 365 U.S. 260, 262 n.4 (1961); *Souffront v. La Compagnie des Sucreries de Porto Rico*, 217 U.S. 475, 486-87 (1910).

In this case, the district court rejected *Merriam*'s holding for essentially two reasons. First, the judge thought *Merriam* was in "silent tension" with Judge Hand's opinion in *Alemite*. Second, she concluded that *Merriam* conflicted with the Supreme Court's decision in *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100 (1969). We disagree on both counts.

Though *Alemite* and *Merriam* reached very different results, the two opinions can be reconciled. For starters, *Alemite* specifically noted that a nonparty to an injunction proceeding may be held in contempt for violating the injunction when the nonparty "either abet[s] the defendant, or [*is*] *legally identified* with him." 42 F.2d at 833 (emphasis added). Moreover, *Alemite*'s result—that a salesman is not bound along with his corporation—is consistent with *Merriam*'s holding that a "key employee," *without more*, is not legally identified with the enjoined company. *Merriam*, 639 F.2d at 37. To be sure, there are factual differences between the two cases, but we find no tension between the two as a legal matter. *See id.* at 39 (distinguishing *Alemite* on these grounds). Both cases recognize the following categories of nonparty contempt liability: (1) aiders and abettors; and (2) those who are legally identified with the enjoined party. "Legal identity" usually means successors and assigns, but it can include a limited class of other nonparties as well—*provided* the evidence establishes a very close identity of interest and such significant control over the organization *and* the underlying litigation that it is fair to say that the nonparty had his day in court when the injunction was issued.

As for the perceived inconsistency between *Merriam* and *Zenith Radio*, here too we disagree. In *Zenith Radio* the Supreme Court reiterated the general rule that a court may not issue an injunction against a person over which the court had not acquired jurisdiction by service of process. 395 U.S. at 110-12; *accord United States v. Kirschenbaum*, 156 F.3d 784, 794-96 (7th Cir. 1998). But the Court clearly anticipated that a nonparty may properly be held in contempt for violating an injunction *if* the court acquires jurisdiction over the nonparty and gives the nonparty an opportunity to contest whether he is bound by the injunction and is in fact in contempt. *Zenith Radio*, 395 U.S. at 112 ("[A] nonparty with notice cannot be held in contempt *until shown to be in concert or participation*. It was error to enter the injunction against Hazeltine, without having made this determination in a proceeding to which Hazeltine was a party." (emphasis added)). Once a court establishes jurisdiction over a nonparty and offers the nonparty this opportunity to be heard on whether concerted action or privity exists, *Zenith Radio* requires nothing further insofar as Rule 65(d)(2) is concerned. *See Lake Shore Asset Mgmt.*, 511 F.3d at 767 (offering similar understanding of *Zenith Radio* and stating "*whether* a particular person or firm is among [those listed in Rule 65(d)(2)(B)-(C)] is a decision that may be made only after the person in question is given notice and an opportunity to be heard"); *see also id.* (Nonparties still "act at their peril if they disregard the commands of the injunction, for, if the district court ultimately determines that they are in concert with [the enjoined party], then they will be in contempt of court.");

*Waffenschmidt v. MacKay*, 763 F.2d 711, 718 (5th Cir. 1985) (similar).

The district court read *Zenith Radio* more generally to stand for the proposition that "a non-party cannot be personally bound by an injunction unless that non-party has had an *actual* day in court in its own right." That's a true statement, but the "day in court" at issue in *Zenith Radio* refers to the nonparty's opportunity to contest whether he acted in concert with a party contemnor or was in privity and therefore bound by the injunction. If after an appropriate hearing the court concludes that the nonparty was in privity with the enjoined party, *Zenith Radio* does not require relitigation of the underlying controversy. (To the contrary, as we have noted, the general rule is that contempt proceedings may not be used to collaterally attack the injunction.) *Merriam* does not hold, or even suggest, that a court may find a nonparty in contempt without acquiring personal jurisdiction over him and providing an opportunity to contest the grounds for finding him bound by and in contempt of the injunction. *Merriam* does not violate the rule in *Zenith Radio*.[5]

Finally, though we have few cases in this area, none conflict with the approach taken in *Merriam*, and one suggests substantial agreement. *Reich v. Sea Sprite Boat Co.* held that the president and sole shareholder of Sea Sprite,

---

[5] The proceedings in this case fully complied with *Zenith Radio*. The respondents were served with process, and the court held an evidentiary hearing offering them ample and complete opportunity to contest whether they came within Rule 65(d)(2).

an enjoined corporation, was in contempt for diluting the bound corporation's assets and thereafter establishing a new company to evade the injunction. 50 F.3d 413. We explained that the enjoined company's president, Robert Smith, "was obliged to secure Sea Sprite's compliance [with the injunction]; instead he ensured its defiance. The formation of [the new company] for the admitted purpose of evading judgments against Sea Sprite was a further act of contempt." *Id.* at 417. While the new company was clearly a successor in interest to the bound corporation, our reasoning suggests that contempt against the president and sole shareholder was appropriate because he was legally identified with Sea Sprite (in the sense that he completely controlled it), personally participated in the injunction proceedings, and directed the use of the new corporation to violate the injunction. *Id.* ("A sale of Sea Sprite's assets to an unrelated party would pose different, and potentially difficult problems. . . . A shuffle between two corporations, both wholly owned by Smith, cannot avoid the injunction." (citation omitted)); *see also Rockwell Graphic Sys.*, 91 F.3d at 922 (Eschbach, J., concurring) (stressing that the president of an enjoined company "finds no quarter in the fact that [the company] is no longer in existence"). *Merriam* has been cited with approval by one circuit, *see Flowdata*, 154 F.3d at 1352-53, and has not been expressly rejected anywhere else.

Accordingly, it was a mistake to reject *Merriam*. A key officer, employee, or shareholder of an enjoined corporation may be personally bound by the injunction after the corporation dissolves *if* he is so closely identified in interest and had a controlling role in the corporation and in

the underlying litigation that it is fair to conclude that he had his day in court when the injunction was issued. The Federal Circuit has identified the following factors that may be pertinent to the *Merriam* inquiry: "[T]he officer's position and responsibilities in the enjoined corporation, his participation in the litigation that preceded the entry of the injunction, and the degree of similarity between his activities in the old and new businesses." *Id.* at 1352 (explaining the *Merriam* test). It bears emphasizing that due process requires an extremely close identification and will be satisfied only when the nonparty "key employee" against whom contempt sanctions are sought had substantial discretion, control, and influence over the enjoined organization—both in general and with respect to its participation in the underlying litigation—*and* there is a high degree of similarity between the activities of the old organization and the new. *See Merriam*, 639 F.2d at 39 (finding analogy to piercing-the-corporate-veil doctrine to be "apt").

### D. Marangella, Schlatter, and the Provisional National Council

Although it rejected *Merriam*, the district court's findings are sufficiently detailed and supported by the record that we can affirm the court's no-privity finding without a remand. Of particular importance are the court's findings regarding the dissimilarities between the Hereditary Guardianship and the Provisional National Council, and the break between Remey and his followers on the one

hand and Marangella, Schlatter, and their coreligionists on the other. It is true that Marangella and Schlatter occupied key positions in the Hereditary Guardianship, and both participated in varying degrees in the underlying trademark litigation. In other circumstances we might require more detailed fact-finding regarding the precise role each nonparty alleged contemnor played in the enjoined organization and in the underlying injunction litigation. For reasons we will explain, however, we can dispense with that here.

The district court concluded that the Provisional National Council, which represents those who accept Marangella as the Third Guardian, is substantially dissimilar to the Hereditary Guardianship; the record supports this conclusion. Although Marangella, Schlatter, and other members of the Provisional National Council were actively involved in the Hereditary Guardianship in the 1960s, the record reflects that after the injunction was issued and the Hereditary Guardianship dissolved, the remnants of this dissident group scattered. After a two-year period of dormancy, Marangella announced his own Guardianship and broke with Remey on matters of successorship, doctrine, and governance. Schlatter followed him, and a new religious organization was established, albeit (eventually) operating in the same place and with some of the same people as were involved in the Hereditary Guardianship. The new group, in due course, took the name "Provisional National Council." The district court specifically found that "the vast weight of the record evidence establishes that the [Provisional National Council] was not formed for the purpose of escaping the con-

fines of the injunction." The court also found that its membership—numbering about 40 people—"did not in fact encompass all of the same individuals that comprised the [Hereditary Guardianship]." Based on these facts, the court concluded that on a "defining point of organizational purpose, there existed a robust doctrinal divide" between the Hereditary Guardianship and the Provisional National Council. The court also concluded that the latter was not "operating in effect" as the former, nor did there "otherwise [exist] a substantial continuity between the two groups."

These findings and conclusions are sufficient to defeat any claim that Marangella, Schlatter, and the Provisional National Council are "legally identified" with the Hereditary Guardianship and therefore in privity with it and bound by the 1966 injunction. This is so even assuming Marangella and Schlatter could be considered "key" officers or agents of the Hereditary Guardianship. The doctrinal differences—especially when combined with the passage of time—make it clear as a matter of law that the Provisional National Council and its principals cannot be considered "legally identified" with the Hereditary Guardianship or Remey. To take note of these differences is not to decide a religious dispute; the district court's findings and conclusions do not transgress *Presbyterian Church*. Accordingly, even when *Merriam* is taken into account, the district court's no-privity conclusion as to this group of alleged contemnors was correct.

### E.  Second International Council and Bahá'í Publishers

The National Spiritual Assembly also challenges the district court's decision that the Second International Council and Bahá'í Publishers are not bound by the injunction. It offers two reasons for binding these nonparties: First, they were created by Jensen, who (the argument goes) was personally bound by the injunction; and second, they are successors in interest to Remey, who also was personally bound by the injunction.

#### 1.  The Jensen Connection

The district court rejected the contention that the Second International Council and Bahá'í Publishers were in privity with the Hereditary Guardianship through Jensen. After declining to apply *Merriam*, the judge explicitly entered an alternative holding that Jensen was not legally identified with the Hereditary Guardianship even if *Merriam* applied. The judge acknowledged that Jensen was an incorporator of the Hereditary Guardianship, that he served as one of its first board members, and that contemporaneous evidence suggested that Jensen remained a follower of the Hereditary Guardianship during the underlying litigation. Nevertheless, the court found that Jensen disassociated himself from any governing role in the organization shortly after serving his one-year term on the board. This was well before the underlying injunction was issued.

The National Spiritual Assembly disputes these findings. It argues that Jensen's extensive involvement with the Hereditary Guardianship prior to the underlying litigation

establishes legal identity. We see no clear error in the district court's findings, which were amply supported by the record. Jensen's term on the Hereditary Guardianship board ended in the middle of 1964; he was not reelected as a board member. After he lost reelection, he did not serve in a governance, advisory, or any other controlling position in the Hereditary Guardianship, and he had no involvement in the underlying litigation. As such, Jensen did not occupy the sort of "key" role in the Hereditary Guardianship—either generally or with respect to injunction litigation—that could form the basis of a "legal identity" finding under *Merriam*.

The National Spiritual Assembly argues in the alternative that Jensen (and by extension, the Second International Council and the Bahá'í Publishers) should be bound by the injunction because Jensen remained an adherent and the Hereditary Guardianship adequately represented its believers' interests in the underlying suit against the National Spiritual Assembly. The Supreme Court in *Taylor* and our own recent decision in *Tice* recognize that the concept of privity in preclusion doctrine includes a very limited adequate-representation category. *See Taylor*, 553 U.S. at 894 (observing that "adequate representation" by "someone with the same interests who [wa]s a party" to the earlier suit sufficed for privity purposes "in certain limited circumstances," including "properly conducted class actions" and "suits brought by trustees, guardians, and other fiduciaries"); *Tice*, 162 F.3d at 973 ("[U]nless a formal kind of successor interest is involved . . . , there should be some indication . . . that the second party either had participated or had a legal duty to participate."); *see*

*also* RESTATEMENT (SECOND) OF JUDGMENTS § 41 (similarly limiting adequate-representation theory of privity). The trademark litigation 44 years ago does not fit into this limited category.

A finding of privity based on "adequate representation" in the circumstances of this case would be entirely unwarranted. The Hereditary Guardianship did not conduct the underlying litigation as anything like a fiduciary for its members, and there is no evidence to suggest it was acting in a representative capacity for its followers *personally*. To find privity based on "adequate representation" here would treat every suit by an organization as having res judicata and contempt implications for the organization's members *individually*. This is contrary to the Supreme Court's language in *Taylor* carefully limiting the scope of the adequate-representation category of privity.

At bottom, this argument is an appeal to the theory of "virtual representation," which the Supreme Court has firmly rejected in the field of claim preclusion. *Taylor*, 553 U.S. at 904. Having rejected virtual-representation theory in its traditional res judicata setting, we see no reason why the Supreme Court would view it more favorably in the context of injunctions. The district court properly rejected the attempt to bind the Second International Council and Bahá'í Publishers through Jensen.

### 2. The Remey Connection

The National Spiritual Assembly also argues that the Second International Council and Bahá'í Publishers are

bound by the injunction through privity with Remey. This argument is based on trademark-registration filings with the United States Patent and Trademark Office in which Neal Chase, the current president of the Second International Council and Bahá'í Publishers, explained that the throne to the "Davidic kingdom" passed by succession from Bahá'u'lláh to Abdu'l-Bahá, to Charles Mason Remey, to Pepe Remey (Remey's adopted son), and now to him. The National Spiritual Assembly treats these filings as an admission of legal successorship to Remey, who in turn was legally identified with the Hereditary Guardianship.

The district court treated the trademark-registration filings as nonbinding evidentiary admissions rather than binding judicial admissions. *See Help at Home, Inc. v. Med. Capital, L.L.C.*, 260 F.3d 748, 753 & n.2 (7th Cir. 2001); *Higgins v. Mississippi*, 217 F.3d 951, 954 (7th Cir. 2000); *Murrey v. United States*, 73 F.3d 1448, 1455 (7th Cir. 1996); *Keller v. United States,* 58 F.3d 1194, 1198 n.8 (7th Cir. 1995). The National Spiritual Assembly apparently agrees with this characterization, but argues that the court gave them insufficient weight. We find no fault with the district court's treatment of this factual matter. Other than the version of spiritual-leadership succession described in trademark filings, the National Spiritual Assembly offered no evidence of a link between Remey and the Second International Council or Bahá'í Publishers. Indeed, Remey had no involvement in either organization and died more than 25 years before the Second International Council was established. Neither the Second International Council nor Bahá'í Publishers received any money, property, or other assets from Remey or the Hereditary Guardianship. On

these facts the district court properly concluded that the Second International Council and Bahá'í Publishers are not successors to Remey. *See Walling*, 321 U.S. at 674 (successors are "those to whom the business may have been transferred"); *Flowdata*, 154 F.3d at 1355 (nonparty successorship liability under injunction requires a "substantial continuity of identity"); *cf. Golden State Bottling Co.*, 414 U.S. at 179 (finding bona fide purchaser of a business enterprise was the legal successor to the enterprise and thus subject to enterprise's liability); *Reich*, 50 F.3d at 417 (a company that "acquired the business subject to this court's order" was legal successor and bound by the order).

AFFIRMED.