# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| PETER E. DEUTSCH, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | C.A. No. 8014-VCL |
| | ) | |
| ZST DIGITAL NETWORKS, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

Date Submitted: March 26, 2018
Date Decided: June 14, 2018

Theodore A. Kittila, James G. McMillan, III, HALLORAN FARKAS + KITTILA LLP, Wilmington, Delaware; David Graff, ROBINS KAPLAN LLP, New York, New York; *Attorneys for Receiver Robert W. Seiden*.

David L. Finger, FINGER & SLANINA, LLC, Wilmington, Delaware; *Attorney for Non-parties Bo Zhong and Lin Zhong*.

**LASTER, V.C.**

ZST Digital Networks, Inc. (the "Company") is a Delaware corporation which, through three intermediate holding companies, owns an operating company that does business in China and is organized under Chinese law. The Company raised capital by accessing the public markets in the United States. It has since delisted.

Peter Deutsch owns a significant block of stock in the Company. Deutsch sought books and records from the Company. The Company failed to appear, defaulted, and judgment was entered against it.

Deutsch sought to enforce the default judgment. The Company failed to comply. Deutsch demonstrated that the Company was in contempt of this court's order.

As a coercive sanction, I appointed a receiver with the authority to cause the Company to comply with the judgment. The receiver has spent five years and invested significant resources attempting to cause the Company to comply. The receiver has obtained additional orders from this court imposing further sanctions for contempt. The receiver also has secured the assistance of other courts in multiple domestic and international jurisdictions.

After other coercive sanctions proved ineffective, the receiver moved for the issuance of bench warrants calling for the arrest of two senior officers of the Company. Both are Chinese nationals, but they frequently visit the United States. Because of arrangements that the United States government has made for the enforcement of arrest warrants, issuing the bench warrants should result in the senior officers being arrested when next they visit the United States.

1

The senior officers previously ignored this action. Faced with the current motion, they hastily appeared and raised a slew of objections, which this decision rejects. This decision nevertheless holds that the facts of the case call for additional proceedings before issuing arrest warrants.

The receiver shall submit a form of order that specifically directs the two officers to take or cause the Company to take the actions which the Company has failed to take to date. The order shall require compliance within sixty days. If the officers fail to comply with that order, then the receiver may seek the issuance of bench warrants as a coercive sanction for contempt.

## I. FACTUAL BACKGROUND

The Company defaulted in this action, with the consequence that the court "accepts as true all the averments in the complaint, as a matter of law."[1] Other facts are drawn from prior rulings in this case, the receiver's periodic reports to the court, the Company's public filings, the current motion for contempt, and documents submitted in connection with the motion. Because the Company and its principals have steadfastly ignored this proceeding, the court has not yet conducted an evidentiary hearing with the benefit of adversarial presentations. The description of the factual background in this decision, therefore, does

---

[1] *Whitwell v. Archmere Acad., Inc.*, 2008 WL 1735370, at *5 (Del. Super. Apr. 16, 2008); *accord Campbell v. Robinson*, 2007 WL 1765558, at *3 (Del. Super. June 19, 2007) ("Upon entering default judgment, the Court accepted as true all well-pleaded allegations in Plaintiffs' complaint."); *Carlton Invs. v. TLC Beatrice Int'l Hldgs., Inc.*, 1996 WL 426501, at *1 (Del. Ch. July 24, 1996) (Allen, C.) ("The effect of a default is simply to admit all of the well-pleaded allegations of the complaint.").

not represent formal factual findings. It rather represents how the record appears at this stage.

## A.     The Holding Company Structure

The Company is the ultimate parent entity in a holding company structure. Through its subsidiaries, the Company is "principally engaged in supplying digital and optical network equipment to cable systems operators in the Henan Province of China."[2] Bo Zhong is the Chairman of the Board and Chief Executive Officer of the Company. His son, Lin Zhong, is a director and Chief Financial Officer of the Company.[3]

The Zhongs used the Company as a vehicle for accessing the U.S. capital markets. In October 2009, the Zhongs and the Company completed an underwritten, all-secondary offering and listed the Company's shares on the NASDAQ Global Market.[4] The offering raised approximately $29,976,960. After the offering, the Zhongs controlled 43.57% of the Company's shares.[5]

---

[2] *See* ZST Digital Networks, Inc., Prospectus 1 (Oct. 20, 2009) [hereinafter Prospectus]. This court can take judicial notice of public filings with the SEC. *See, e.g.*, *DFC Glob. Corp. v. Muirfield Value P'rs, L.P.*, 172 A.3d 346, 351 n.7 (Del. 2017).

[3] The parties and the documents refer inconsistently to the Zhongs, at times placing their family name first in Chinese fashion (*i.e.*, Zhong Bo and Zhong Lin), and at other times placing their family name second in Western fashion (*i.e.*, Bo Zhong and Lin Zhong). The briefs use the latter format, which this decision adopts. Because the Zhongs share a family name, this decision refers to the father as Bo and the son as Lin. No disrespect is intended.

[4] *See generally* Prospectus.

[5] *See* Prospectus at 22.

The Company's principal asset is its ownership of 100% of the equity of World Orient Universal Limited, a corporation organized under the laws of the British Virgin Islands. World Orient in turn owns 100% of the equity of Global Asia Universal Limited, also organized under the laws of the British Virgin Islands. Global Asia owns 100% of the equity of EverFair Technologies, Ltd., a corporation organized under the laws of Hong Kong. For simplicity, this decision refers to World Orient and Global Asia as the "BVI Subsidiaries" and to EverFair as the "Hong Kong Subsidiary."

At the base of the tower is Zhenzhou Shenyang Technology Company Limited, an entity organized under the laws of the People's Republic of China and controlled by the Hong Kong Subsidiary. Directly or through additional subsidiaries of its own, Zhenzhou Shenyang carries out the Company's business operations. For simplicity, this decision calls it the "Operating Company."

## B.     The Company Goes Dark.

After its IPO, the Company made a series of regular periodic reports and appeared to be financially healthy.[6] That changed on March 26, 2012, when the Company announced that its outside auditors had resigned. In their public resignation letter, the auditors stated that the Company had obstructed their efforts to verify its cash and account balances, preventing the auditors from satisfactorily completing their audit for fiscal year 2011 and

---

[6] *See, e.g.*, Dkt. 16 Ex. 3 (Company's Form 10-Q for the quarter ending September 30, 2011, showing over $100 million in assets, only $11.1 in liabilities, and no long-term indebtedness).

4

forcing them to resign.[7] The auditors also stated that they could no longer certify the results of their audit of the Company's financial statements for fiscal year 2010.

On April 6, 2012, the Company announced that it was voluntarily delisting its shares from the NASDAQ. The Company stated that its shares would continue to be available for over-the-counter trading.[8]

On May 29, 2012, the Company announced the resignation of Li Zhi Tian, a director who served on the Audit Committee and the Compensation Committee and who chaired the Nominating Committee.[9]

On August 13, 2012, the Company terminated its listing with the United States Securities and Exchange Commission.[10] Following the termination, the Company was no longer obligated to make periodic filings with the SEC.

## C.    The Section 220 Action

Deutsch is one of the Company's largest outside investors. He currently holds 3,931,370 shares of the Company's common stock.[11]

---

[7] *See* Dkt. 16 Ex. 12 (Company's Form 8-K announcing resignation of the auditors).

[8] *See* Dkt. 16 Ex. 13 (Company press release announcing delisting); *see also* Dkt. 16 Ex. 14 (Company's letter to investors seeking to reassure them it was making efforts to come back into compliance).

[9] Compl. ¶¶ 10-12 & Ex. C.

[10] Compl. ¶ 13 & Ex. D.

[11] Compl. ¶ 7; Dkt. 23 Ex. A.

On September 20, 2012, Deutsch sent the Company a demand for books and records pursuant to Section 220 of the Delaware General Corporation Law (the "DGCL").[12] Deutsch provided a list of information that he sought on an attached schedule.

On October 16, 2012, the Company responded. Acting through its counsel, Pillsbury Winthrop Shaw Pittman LLP, the Company rejected the demand as technically deficient and demanded that Deutsch conduct any inspection in China.[13]

On October 18, 2012, Deutsch provided a revised demand that addressed the technical objections. He requested that any inspection occur in New York or Delaware.[14] On November 2, 2012, Pillsbury Winthrop relayed a letter from the Company reiterating that any inspection must take place in China.[15]

On November 7, 2012, Deutsch filed this action and moved for an expedited schedule. A telephonic scheduling hearing was set for November 16. Pillsbury Winthrop declined to appear, conveniently asserting that although the firm had represented the Company in responding to the Section 220 demand, the firm had not been retained to represent the Company to handle the ensuing Section 220 proceeding.[16] A lawyer with the

---

[12] Compl. ¶ 16 & Ex. E.

[13] Compl. ¶ 19 & Ex. F.

[14] Compl. ¶ 20 & Ex. G.

[15] Compl. ¶ 21 & Ex. H.

[16] Dkt. 14 at 4-5 (hearing transcript).

6

Delaware law firm of Bayard, P.A. joined the conference but stressed on several occasions that he had not yet been retained by the Company.[17]

I established an expedited schedule consistent with the summary nature of the proceeding. To facilitate a prompt disposition of the action, I ordered the Company to answer the complaint by November 21, 2012.[18] The Company did not file an answer by this deadline.

On November 26, 2012, Deutsch moved for entry of default judgment.[19] When the Company did not make any effort to appear or respond to the motion, I held that the Company had defaulted and entered default judgment.[20]

The default judgment granted Deutsch the right to inspect the books and records he sought. It also awarded Deutsch his attorneys' fees and costs.

## D. The Appointment Of The Receiver

The Company made no effort to comply with the default judgment. On January 25, 2013, Deutsch moved to hold the Company in contempt.[21] By order dated January 31, I required the Company to show cause why it should not be held in contempt and set March

---

[17] *See id.* at 3.

[18] *See* Dkt. 7.

[19] Dkt. 10.

[20] Dkt. 14.

[21] Dkt. 16.

18 as the deadline for the Company to file a response.[22] The Company did not file a response. Accordingly, by order dated March 20, I held that the Company had violated the default judgment and was in contempt.[23]

The order finding the Company in contempt awarded Deutsch the relief he had requested in his motion. That relief included (i) the attorneys' fees and costs incurred prosecuting the contempt claim, (ii) an option to put his shares to the Company at a price of $8.21 (the "Put Right"), and (iii) the appointment of a receiver pursuant to Section 322 of the DGCL "for the purpose of enforcing the Company's compliance with the Court's orders."[24]

On March 25, 2013, Deutsch exercised the Put Right.[25] He also submitted a form of order to appoint Robert W. Seiden as the receiver. I entered the order on March 28.[26] The order empowered the receiver to "take all actions he deems appropriate to obtain [the

---

[22] Dkt. 18.

[23] Dkt. 22.

[24] *Id.* ¶ 4; *see* 8 *Del. C.* § 322 ("Whenever any corporation shall refuse, fail or neglect to obey any order or decree of any court of this State within the time fixed by the court for its observance, such refusal, failure or neglect shall be a sufficient ground for the appointment of a receiver of the corporation by the Court of Chancery.").

[25] Dkt. 23 Ex. A.

[26] Dkt. 24.

8

Company's] compliance with" the default judgment, the orders entered to date, and "such other and further orders as the Court may enter in this action."[27]

The order granted the receiver broad powers for purposes of compelling compliance. Paragraph 3 of the order stated:

> The Receiver shall have all powers generally available to a receiver appointed pursuant to 8 *Del. C.* § 291, unless any such power would be inconsistent with a specific provision of this Order, in which case this Order shall govern. Upon the acceptance of this appointment, the Receiver shall have full authority and control over the property and/or assets of the Company, of whatever kind and wherever located, in the United States of America, the People's Republic of China or elsewhere. This includes, without limitation, authority to seize, deal in or dispose of any property of the Company. The Receiver shall have full and unrestricted access to all books and records of the Company, in whatever mode maintained and wherever located, in the United States of America, the People's Republic of China or elsewhere. The Receiver may assert sole control over any present bank or other accounts of the Company and/or establish signature authority over such accounts as the Receiver deems appropriate. The Receiver shall have the power to commence, continue, join in, and/or control any action, suit or proceeding, of any kind or nature, in the name of the Company or otherwise, including without limitation proceedings to prevent or avoid transactions of any kind or nature that may hinder the Company's compliance with this Court's orders. The Receiver is authorized, in his sole discretion, to enlist the help of the employees or agents of the Company. The directors, officers, employees, and agents of the Company shall cooperate with the Receiver in the performance of his duties. The Receiver is authorized, in his sole discretion, to enlist the help of agents, employees or representatives of the governments of the United States of America, the People's Republic of China, or any other nation, or of any regional or local governments therein, or of any other regulatory body. The Receiver shall have the authority, but shall not be required, to petition this Court for instructions at any time or from time to time.[28]

---

[27] *Id.* ¶ 3.

[28] *Id.*

9

Paragraph 6 authorized the receiver "to act through and in the name of the Company to carry out his duties."[29] The same paragraph authorized the receiver "to execute and deliver (or cause to be executed and delivered) any document in the name of the Company, including but not limited to contracts, deeds, other documents of title, and regulatory, administrative and governmental filings."[30]

The order also instructed the Company's officers and directors to cooperate with the receiver's efforts. Paragraph 8 stated:

> The appointment of the Receiver hereunder is binding upon the directors, officers, employees, agents and stockholders of the Company, who shall cooperate with the Receiver in the performance of his duties. Neither the Company, nor [any] person acting or purporting to act on behalf of the Company, nor any director, officer, employee, agent, stockholder or creditor of the Company shall institute any proceeding in any forum other than this Court challenging any action, recommendation or decision by the Receiver.[31]

Under this paragraph, the Zhongs are obligated to cooperate with the receiver.

## E. The Receiver Takes Control Of The BVI And Hong Kong Subsidiaries

Using his authority, the receiver petitioned the United States District Court for the Southern District of New York for the issuance of orders authorizing the receiver to seize books and records held by the Company's former CFO, its investor relations firm, and its

---

[29] *Id.* ¶ 6 (the "Authority Paragraph").

[30] *Id.*

[31] *Id.* ¶ 8 (the "Cooperation Paragraph").

accountants. On April 16, 2013, the federal court issued the orders, and the receiver obtained the documents.[32]

The receiver next began the difficult process of exercising control over the BVI Subsidiaries, the Hong Kong Subsidiary, and the Operating Company. The boards of directors of the BVI Subsidiaries resisted, necessitating efforts to replace those individuals with directors who would cooperate with the receiver. To facilitate these efforts, the receiver sought an order confirming his authority to vote the shares of the Company's direct and indirect subsidiaries, including to effectuate changes to their respective boards of directors. By order dated April 19, 2013, I confirmed that the receiver had this authority.[33]

Exercising his authority, the receiver replaced the directors of the BVI Subsidiaries and sought an order from a British Virgin Islands court confirming the validity of his actions.[34] On May 31, 2013, Bo filed a lawsuit in the same court contesting the receiver's actions.[35] The British Virgin Islands court rejected Bo's efforts, and on July 25, the Eastern Caribbean Supreme Court dismissed his challenge.[36]

---

[32] *See* Dkt. 34 at 3.

[33] Dkt. 31.

[34] Dkt. 194 ¶ 3. This docket item contains an Affidavit of Court-Appointed Receiver Robert W. Seiden, Esq. in Support of Motion for Contempt, cited hereafter as "Seiden Aff."

[35] Dkt. 47 at 4; *see also* Seiden Aff. ¶ 3.

[36] Dkt. 73 Ex. A.

The receiver next caused the second-tier BVI Subsidiary to exercise its voting power as the sole stockholder of the Hong Kong Subsidiary to remove Xue Na, the sole director of the Hong Kong Subsidiary, and appoint new directors. Na refused to recognize the legitimacy of these actions. To confirm their validity, the receiver caused the Hong Kong Subsidiary to convene an extraordinary general meeting at which Na was removed and new directors appointed.[37]

## F. Na's Attempt At Intervention

On August 14, 2013, Na moved to intervene in this action in her individual capacity as a stockholder of the Company. She sought to modify the orders holding the Company in contempt and appointing the receiver. She argued that she had standing as a stockholder to take these steps because the receiver's actions were harming her.[38] Duane Morris LLP represented Na. At the time, Duane Morris was serving as counsel to the Company in several pending matters in other jurisdictions.

Deutsch and the receiver opposed Na's motion. They portrayed the motion as a thinly veiled attempt by the Zhongs to defend the action by proxy after permitting the Company to default. They argued that the motion should be denied and conditions imposed on the appearance of any stockholder who sought to represent the Company.[39]

---

[37] Dkt. 40 at 5-6; Seiden Aff. ¶ 4.

[38] Dkt. 60.

[39] Dkt. 64.

A hearing on Na's motion was held on August 23, 2013. I ruled that the Company, not Na, was the proper party to seek the relief that Na requested and that Na had no standing to intervene in her capacity as a stockholder. I granted the Company two weeks in which to appear if it wished to seek the relief that Na had requested. I also held that the Company should have to satisfy conditions before being able to set aside the default judgment and litigate the case on the merits, such as paying the expenses that Deutsch and the receiver had incurred. Rather than imposing conditions unilaterally, I instructed the parties to confer on appropriate conditions under which the default judgment would be set aside.[40]

On September 6, 2013, Duane Morris entered an appearance on behalf of the Company,[41] but the parties were unable to agree on an appropriate set of conditions.[42] On September 23, I held a status conference.[43] Afterwards, the parties engaged in extensive efforts to reach an amicable resolution that included teleconferences and in-person meetings,[44] but they could not reach agreement.[45]

---

[40] Dkt. 81 at 26-27, 37-39 (transcript).

[41] Dkt. 77.

[42] Dkt. 83.

[43] Dkt. 87.

[44] *See* Dkts. 88, 91.

[45] Dkt. 93.

On November 12, 2013, I entered an Order Establishing Conditions for Defendant's Post-Default Judgment Participation in this Action (the "Conditions Order").[46] It provided that before the Company or any of its affiliates, including Na, Bo, or the Company's other directors or officers, could appear and participate in this action, the Company would have to:

- "[P]rovide [Deutsch] and [the] Receiver with (i) unaudited financial statements (i.e., balance sheets and income statements) for the quarter ended September 30, 2013 and (ii) audited financial statements for the year ended December 31, 2012. On a continuing basis, [the Company] shall provide (i) unaudited quarterly and annual financial statements within ten calendar days following the end of each such reporting period and (ii) audited annual financial statements within a reasonable period of time following the end of each reporting year."[47]

- "[P]ay to the Receiver the sum of $2,020,000, which sum approximates the amount of fees and expenses incurred by the Receiver through October 20, 2013, plus interest from that date until the date of payment, calculated at the legal rate compounded quarterly. In the alternative, [the Company] shall post with the Register in Chancery a bond with surety in the amount of $3 million, in a form satisfactory to the Court, and [the Company] shall make interim payments to the Receiver of $200,000 per month until such time as all fees and expenses then due and outstanding are paid in full. If [the Company] has posted a bond, then periodically but not more frequently, [the Company] may apply to reduce the amount of the bond by the amount paid."[48]

- "For the purpose of providing security for [the Company's] outstanding debt to [Deutsch] pursuant to the [Put Right] . . . post with

---

[46] Dkt. 98.

[47] *Id.* ¶ 2.

[48] *Id.* ¶ 3.

14

the Court a bond with surety, in a form satisfactory to the Court, in the amount of $5 million."[49]

The Conditions Order gave the Company until November 29, 2013 to enter an appearance in compliance with its terms. After that, the Company would be deemed to "again have waived voluntarily its right to appear and participate in this action . . . [and] be deemed a non-party for purposes of service and access to documents filed with the Court."[50] The Company did not enter an appearance.

## G. Efforts To Sell The Operating Company

After the parties' negotiations failed and the Company did not appear, the receiver decided to try to sell the Hong Kong Subsidiary. In December 2013, he engaged Aegis Capital Corporation to act as financial advisor in connection with the sale.[51]

On December 17, 2013, the receiver moved for the entry of an order establishing procedures to govern the sale process.[52] No one opposed the motion. I held a hearing at which no one appeared to object. By order dated January 16, 2014, I approved the proposed sale process.[53]

---

[49] *Id.* ¶ 4.

[50] *Id.* ¶ 5.

[51] Seiden Aff. ¶ 7; *see also* Dkt. 129 ¶ 5 (the "Gazdak Aff.").

[52] Dkt. 104.

[53] Dkt. 117.

The receiver carried out a sale process in accordance with the order. His advisors sent teasers to over forty potential bidders.[54] Five potential bidders expressed interest, entered into nondisclosure agreements, and conducted diligence.[55] One bidder submitted a letter of intent offering to acquire the Hong Kong Subsidiary for $15 million, subject to due diligence and other conditions.[56] One condition required negotiations with Bo, Lin, and other members of the Operating Company's management team.[57]

In violation of the Cooperation Paragraph in the order appointing the receiver, Bo, Lin, and the management team did not cooperate with the receiver's efforts. They refused to grant any physical access to the Operating Company's facility or to provide the bidder with additional financial information.[58] In the face of this resistance, the potential buyer withdrew.

Undeterred, the receiver engaged Business Development Asia (HK) Ltd., a financial advisor that specializes in cross-border transactions involving Asian assets. With the assistance of the new firm, the receiver conducted a new sale process.[59] This time,

---

[54] Gazdak Aff. ¶¶ 10-11.

[55] *Id.* ¶ 12.

[56] *Id.* ¶ 14.

[57] *Id.* ¶¶ 16-17.

[58] Seiden Aff. ¶ 7; *see also* Dkt. 137.

[59] *See* Dkt. 147 at 2 & Ex. A.

16

approximately a dozen parties expressed interest.[60] They too wanted current financial information and cooperation from management.[61] Again in violation of the Cooperation Paragraph, Bo, Lin, and the management team again did not cooperate with the receiver's efforts.

In October 2014, the receiver and Bo met to discuss settlement. Although they did not reach agreement, the receiver agreed to pause any enforcement efforts pending another meeting in February 2015.[62] That meeting failed to produce an agreement.[63]

## H.     Transfers Of Company Assets

On June 23, 2015, the Hong Kong Subsidiary passed a resolution (i) removing Bo as a director and the legal representative of the Operating Company and replacing him with the receiver's nominee and (ii) ordering Bo to surrender the Operating Company's registration documents and "chops."[64] Bo responded by transferring real estate and other assets worth approximately $3 million from the Company to Wilke Technology Co. Ltd., a company controlled by Lin.[65]

---

[60] Dkt. 150 at 2.

[61] *Id.*; Dkt. 153 at 2

[62] Dkt. 155 at 2.

[63] *See* Dkt. 166.

[64] Seiden Aff. ¶ 9. A company's "chops" are the Chinese equivalent of a corporate seal, but have greater significance as a source of legal authority under Chinese law.

[65] *Id.*

17

The receiver sued Bo in China over the transfers.[66] On October 27, 2015, the Chinese court dismissed the lawsuit for failing to comply with certain technical requirements.[67] The dismissal was affirmed in February 2016.[68]

In July 2016, the receiver and Bo held a face-to-face meeting in China. After a full day of negotiations, the parties reached an agreement in principle on the terms for settlement. But once the receiver returned to the United States, Bo reneged.[69]

After the failed negotiations in the summer of 2016, the receiver spent over a year attempting to apply pressure on Bo through diplomatic channels.[70] Those efforts also failed.

## I.     The Contempt Motion

On January 11, 2018, the receiver moved for a Rule to Show Cause why Bo and Lin should not be held in contempt for failing to cooperate with the receiver. By order dated January 19, I entered an order to show cause. It stated:

> 1. A hearing (the "Hearing") shall be held on March 26, 2018 at 2:00 p.m. (Eastern) before Vice Chancellor J. Travis Laster, Court of Chancery of the State of Delaware, 500 North King Street, Wilmington, Delaware 19801, at which time Mr. Bo Zhong and Mr. Lin Zhong shall appear and show cause as to why they should not be held in civil and criminal contempt for this Court's orders pursuant to

---

[66] Dkt. 173.

[67] Dkt. 176.

[68] Dkt. 179 at 2.

[69] Dkt. 182.

[70] *See* Dkts. 185, 188.

18

Court of Chancery Rule 70(b) and Rule 71, and at which time the Court may consider such other and further relief as the Court deems appropriate and enter an order of civil and criminal contempt;

2. Mr. Bo Zhong and Mr. Lin Zhong shall submit any papers in response to the Receiver's motion for an order of civil and criminal contempt not less than 7 days before the Hearing; and

3. The Receiver shall forward a copy of this order and the pleadings related to the motion to the last known address for [] Mr. Bo Zhong and Mr. Lin Zhong, and shall certify to the Court the manner in which such notice has been given.[71]

The receiver delivered the order and copies of his filings to Bo via email, text message, and Federal Express.[72] Bo's assistant confirmed that he had received the documents and had forwarded them to Bo.[73] In several communications, Bo told the receiver that he could not travel abroad to attend the hearing.[74] Through his assistant, Bo subsequently asked the receiver to postpone the hearing.[75]

---

[71] Dkt. 199 ¶¶ 1-3. The Order to Show Cause was granted as proposed by the Receiver, with a modification to add the date and time of the hearing. This text shows the Order to Show Cause as modified.

[72] *See* Dkt. 205 ¶¶ 3-14. This docket item contains an Affidavit of Zhenling Zhang in Support of Reply Brief on Motion for Rule to Show Cause, cited hereafter as "Zhang Aff."

[73] *Id.* ¶ 5 & Ex. A.

[74] Zhang Aff. ¶¶ 7-9.

[75] *Id.* ¶ 13.

On March 19, 2018, the last possible day to respond, counsel entered a limited appearance on behalf of the Zhongs. Counsel filed a ten-page opposition advancing various reasons why the Zhongs could not be held in contempt.

## II. LEGAL ANALYSIS

The receiver seeks an order holding the Zhongs in contempt and the issuance of bench warrants to arrest the Zhongs as a coercive sanction to compel them to comply with this court's orders. Courts have inherent authority to impose contempt sanctions for violations of their orders.[76] The power "is essential to the administration of justice."[77] Court of Chancery Rule 70(a) codifies this court's inherent authority to enter contempt sanctions. The rule recognizes that the court may "adjudge [a] party in contempt" if the party "fails to comply within the time specified" with "a judgment direct[ing] a party to . . . perform any . . . specific act."[78]

The Zhongs have raised a series of technical and procedural objections to the receiver's motion. This decision rejects each of those objections. It nevertheless concludes that it is premature to issue bench warrants at this time and that the Zhongs will be given one final chance to comply with this court's orders.

---

[76] *DiSabatino v. Salicete*, 671 A.3d 1344, 1348 (Del. 1996) ("Courts have 'an inherent contempt authority, . . . as a power necessary to the exercise of all others.'" (quoting *United Mine Workers of Am. v. Bagwell*, 512 U.S. 821, 831 (1994))).

[77] *Id.* (quoting *Young v. United States ex rel. Vuitton et Fils, S.A.*, 481 U.S. 787, 795 (1987)).

[78] Ct. Ch. R. 70(a).

## A.    Satisfaction Of The Conditions Order

As a threshold matter, the receiver contends that the Zhongs cannot appear or make any submissions without first satisfying the requirements imposed on the Company in the Conditions Order. The receiver argues that the Zhongs' filings should be stricken on that basis. The Zhongs counter with the bold assertion that the Conditions Order violates the Delaware Constitution and the Constitution of the United States of America.

Court of Chancery Rule 60(b) authorizes the court to vacate a default judgment "upon such terms as are just."[79] As Chancellor Chandler noted while writing as a Judge on the Delaware Superior Court, the power to impose conditions before vacating a default judgment enables a court to protect a plaintiff by, among other things, "requiring the defendant to post a bond for the amount of the judgment."[80] Although this court has rarely exercised this power, federal courts have analyzed frequently the analogous Federal Rule of Civil Procedure.[81] Federal decisions hold that "[t]he imposition of conditions . . . can be used to rectify any prejudice suffered by the nondefaulting party as a result of the default

---

[79] Ct. Ch. R. 60(b).

[80] *Canton Inn, Inc. v. Sec. Ins. Co.*, 1986 WL 2258, at *2 (Del. Super. Jan. 31, 1986).

[81] "Decisions interpreting the Federal Rules of Civil Procedure are usually of great persuasive weight in the construction of parallel Delaware rules; however, such decisions are not actually binding upon Delaware courts." *Cede & Co. v. Technicolor, Inc.*, 542 A.2d 1182, 1191 n.11 (Del. 1988) (citation omitted); *see also Ross v. Ross*, 1994 WL 590494, at *2 (Del. Oct. 11, 1994) (TABLE) ("Because Rule 60(b) of the Family Court is based on Rule 60(b) of the Federal Rules of Civil Procedure, the construction of a Federal Rule by the federal judiciary is given great persuasive weight in the interpretation of a Delaware counterpart.").

and the subsequent reopening of the litigation."[82] "Accordingly, a number of circuits have approved of conditioning the vacatur of defaults or default judgments on the posting of security for payment of all or part of an eventual adjudicated judgment."[83] There is nothing defective about the Conditions Order, which imposed conceptually similar conditions on the ability of the Company to appear, vacate the default judgment, and litigate this matter on the merits.

The receiver's motion seeks to impose coercive sanctions on Bo and Lin. The Conditions Order does not restrict their ability to appear and respond to a motion that is directed at them. It was the Company that defaulted in this action; the Zhongs did not. In any event, an appropriate respect for due process means that the Zhongs should have an opportunity to respond to the receiver's motion without first satisfying the obligations of the Company. The Zhongs filings will not be stricken, and they will be able to appear and defend against any further proceedings related to the receiver's motion for contempt against them without first satisfying the requirements of the Conditions Order.

---

[82] 10A Alan Wright et al., *Federal Rules of Civil Procedure* § 2700 (4th ed. 2017); *see also Serv. Empls. Int'l Union Nat'l Indus. Pension Fund v. Hamilton Park Health Care Ctr., Ltd*, 304 F.R.D. 65, 71-72 (D.D.C. 2014); *Gilmore v. Palestinian Interim Self-Gov't Auth.*, 675 F. Supp. 2d 104, 114 (D.D.C. 2009); *Chase Manhattan Bank v. Iridium Africa Corp.*, 2004 WL 1588295, at *2 (D. Del. July 8, 2004); *Capital Yacht Club v. Vessel AVIVA*, 228 F.R.D. 389, 395 (D.D.C. 2005).

[83] *Powerserve Int'l, Inc. v. Lavi*, 239 F.3d 508, 515 (2d Cir. 2001) (collecting cases).

## B. The Zhongs' Non-Party Status

The Zhongs next argue that because they are not formally parties to this case, they cannot be held in contempt. That is incorrect. An order generally binds not only the named parties, but also "those identified with them in interest, in 'privity' with them, represented by them or subject to their control."[84] This doctrine ensures that a party cannot nullify or evade an order "by carrying out prohibited acts through aiders and abettors, although they were not parties to the original proceeding."[85] The Court of Chancery Rules recognize that in appropriate circumstances, an order can be enforced against non-parties.[86]

Under these principles, an order that applies to an entity extends to directors, officers, and employees of the entity who are acting on behalf of the entity.[87] This doctrine recognizes that

---

[84] *Regal Knitwear Co. v. NLRB*, 324 U.S. 9, 14 (1945).

[85] *Id.*

[86] *See* Ct. Ch. R. 65(d) (recognizing that an order granting an injunction in binding not only upon the parties but also upon "their officers, agents, servants, employees, and attorneys, and upon those persons in active concert or participation with them who receive actual notice of the order by personal service or otherwise"); Ct. Ch. R. 71 (providing that "when obedience to an order may be lawfully enforced against a person who is not a party, that person is liable to the same process for enforcing obedience to the order as if that person were a party").

[87] *See Fulk v. Wash. Serv. Assocs., Inc.*, 2002 WL 1402273, at *11 (Del. Ch. June 21, 2002) (holding that the "officers, employees or agents" of the contemnor "will all be bound by any injunction directed against the current parties"); *Arbitrium (Cayman Is.) Handels AG v. Johnston*, 1997 WL 589030, at *4 (Del. Ch. Sept. 17, 1997) (enforcing order against individuals "in their capacity as agents of the corporation"); *accord Nat'l Spiritual Assembly of Baha'is of U.S. Under Hereditary Guardianship, Inc. v. Nat'l Spiritual Assembly of Baha'is of the U.S., Inc.*, 628 F.3d 837, 847 (7th Cir. 2010) ("[O]fficers, employees, and other agents of an enjoined party must obey the injunction—

[a] command to the corporation is in effect a command to those who are officially responsible for the conduct of its affairs. If they, apprised of the writ directed to the corporation, prevent compliance or fail to take appropriate action within their power for the performance of the corporate duty, they, no less than the corporation itself, are guilty of disobedience, and may be punished for contempt.[88]

Put differently, "[a]n order issued to a corporation is identical to an order issued to its officers, for incorporeal abstractions act through agents."[89]

As a fallback argument, the Zhongs attempt to evade this doctrine through sophistry. They contend that because this court appointed a receiver with power to act on behalf of the corporation, and because the Zhongs have been resisting the receiver rather than colluding with him, they cannot be liable for contempt as agents of the corporation. As the Zhongs see it, the same order that imposed on them a requirement to cooperate with the receiver liberated them from having to comply with that obligation because they could no longer be deemed to be acting on behalf of the Company. In reality, the Zhongs have continued to exercise actual, real-world control over the Company's property and have used that control to resist the authority of the receiver. That is sufficient to make them subject to a potential finding of contempt.

---

even though they are not named parties—when they act in their official capacities."); *New York ex rel. Vacco v. Operation Rescue Nat'l*, 80 F.3d 64, 70 (2d Cir. 1996) ("An injunction issued against a corporation or association binds the agents of that organization to the extent they are acting on behalf of the organization.").

[88] *Wilson v. United States*, 221 U.S. 361, 376 (1911).

[89] *Reich v. Sea Sprite Boat Co., Inc.*, 50 F.3d 413, 417 (7th Cir. 1995) (Easterbrook, J.).

## C. Personal Jurisdiction

The Zhongs also contend that this court lacks personal jurisdiction over them and therefore cannot hold them in contempt. They point out that a party charged with contempt "is always at liberty to defend his disregard of the court's order by showing that the order was void for lack of jurisdiction."[90] Where, as here, no evidentiary hearing has been held "the plaintiff bears the burden" of making "a *prima facie* showing of personal jurisdiction."[91]

The receiver has made the necessary *prima facie* showing that the Zhongs are subject to personal jurisdiction under Section 3114 of Title 10 of the Delaware Code. Section 3114 contemplates a two-pronged analysis. First, the court must analyze whether Section 3114 "provides a proper statutory basis" for its exercise of personal jurisdiction.[92] Second, it must determine "whether the exercise of personal jurisdiction . . . is consistent with [the party's] constitutional expectations of due process."[93]

Section 3114 provides a proper statutory basis for exercising personal jurisdiction over the Zhongs. Subsection 3114(a) states:

> Every nonresident of this State who after September 1, 1977, accepts election or appointment as a director . . . of a corporation organized under the laws of this State . . . shall, by such acceptance . . . , be deemed thereby to have consented to the appointment of the registered agent of such corporation (or,

---

[90] *Mayer v. Mayer*, 132 A.2d 617, 621 (Del. 1957).

[91] *Ryan v. Gifford*, 935 A.2d 258, 265 (Del. Ch. 2007).

[92] *Hazout v. Tsang Mun Ting*, 134 A.3d 274, 292 (Del. 2016).

[93] *Id.*

if there is none, the Secretary of State) as an agent upon whom service of process may be made in all civil actions or proceedings brought in this State, by or on behalf of, or against such corporation, in which such director, trustee or member is a necessary or proper party, or in any action or proceeding against such director, trustee or member for violation of a duty in such capacity, whether or not the person continues to serve as such director, trustee or member at the time suit is commenced. Such acceptance or service as such director, trustee or member shall be a signification of the consent of such director, trustee or member that any process when so served shall be of the same legal force and validity as of served upon such director, trustee or member within this State and such appointment of the registered agent (or, if there is none, the Secretary of State) shall be irrevocable.[94]

Subsection 3114(b) provides analogous jurisdictional authority for officers of the entity.

As the Delaware Supreme Court has explained, Section 3114 permits this court to exercise personal jurisdiction when an officer or director of a corporation "(i) is a 'necessary or proper party' to an action against the corporation; or (ii) violated a statutory or fiduciary duty in his capacity as a director and officer."[95]

The Zhongs are "proper" parties for purposes of the contempt proceedings. A proper party is one "who may be joined in a case for reasons of judicial economy but whose presence is not essential to the proceeding."[96] If the Company had complied with this court's orders, then contempt proceedings against the Zhongs would not be necessary. At this point, because the Company has persisted in failing to comply with this court's orders, it is proper for the court to consider contempt proceedings against the Zhongs in their

---

[94] 10 *Del. C.* § 3114(a).

[95] *Hazout*, 134 A.3d at 280.

[96] *Party*, Black's Law Dictionary (10th ed. 2014); *see also Hazout*, 134 A.3d at 289 n.56 (citing definition).

26

capacities as Company representatives. Indeed, exercising jurisdiction over the Zhongs is arguably necessary for that purpose. The power to assert jurisdiction therefore exists under Section 3114.

Exercising jurisdiction over the Zhongs comports with constitutional due process. "The focus of this inquiry is whether [the party] engaged in sufficient 'minimum contacts' with Delaware to require it to defend itself in the courts of this State consistent with the traditional notions of fair play and justice."[97] "Once it has been decided that a defendant purposefully established minimum contacts with the forum State, these contacts must be considered in light of other factors to determine whether the assertion of personal jurisdiction would comport with fair play and substantial justice."[98]

In my view, this is not a close call. "By becoming a director and officer of a Delaware corporation" each of the Zhongs "purposefully availed himself of certain duties and protections under our law."[99] This action and the potential imposition of contempt sanctions arises from the Zhongs' acceptance of those position. The Delaware Supreme Court explained the implications of these facts when holding that the exercise of personal

---

[97] *AeroGlobal Capital Mgmt., LLC v. Cirrus Indus., Inc.*, 871 A.2d 428, 440 (Del. 2005) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)).

[98] *Sternberg v. O'Neil*, 550 A.2d 1105, 1122 (Del. 1988) (citing *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 477 (1985)), *abrogated on other grounds by Genuine Parts Co. v. Cepec*, 137 A.3d 123 (Del. 2016).

[99] *Hazout*, 134 A.3d at 292.

jurisdiction under Section 3114 comported with due process for purposes of a derivative action:

> The instant litigation seeks to hold the defendants accountable to the Company for their actions as directors of a Delaware corporation. Their status as directors and their power to act in that capacity arise exclusively under the Delaware corporation statutes. The defendants accepted their directorship with explicit statutory notice, via § 3114, that they could be haled into the Delaware Courts to answer for alleged breaches of the duties imposed on them by the very laws which empowers them to act in their corporate capacities. Moreover, the defendants, by purposefully availing themselves of the privilege of becoming directors of a Delaware corporation, have thereby accepted significant benefits and protections under the laws of this State.[100]

The same reasoning applies to this case. When they accepted their roles as officers and directors of a Delaware corporation, the Zhongs were on notice that they could be required to cause the Company to comply with its obligations under Section 220. It should come as no surprise that they are now being brought before the Court of Chancery to enforce compliance. Exercising personal jurisdiction over the Zhongs for purposes of this contempt proceeding comports with due process.

## D.    Other Due Process Concerns

Separate and apart from personal jurisdiction, the Zhongs advance a series of arguments in which they contend that they are being denied due process. Although I believe that the proceedings to date have satisfied the requirements of due process, this decision

---

[100] *Armstrong v. Pomerance*, 423 A.2d 174, 176 (Del. 1980) (citations omitted).

requires that the receiver take additional steps before the court will hold the Zhongs in contempt and issue the requested sanctions.

### 1. The Amount Of Process That Is Due

The amount of process that an alleged contemnor is due depends on whether the alleged contemnor faces civil or criminal contempt. "[C]ivil contempt sanctions . . . may be imposed in an ordinary civil proceeding upon notice and an opportunity to be heard."[101] By contrast, "criminal contempt proceedings must meet the State and Federal Constitutional requirements for the trial and punishment of crimes."[102]

"The distinction between criminal and civil contempt is often cloudy at best but there are commonly used parameters for distinguishing the two."[103] The fact that a party faces imprisonment as a potential sanction does not mean that the contempt is necessarily criminal.[104] Rather, the distinction turns on the purpose of the sanction and the means of purging it. "[W]here the primary purpose is to punish, a contempt proceeding is criminal

---

[101] *Bagwell*, 512 U.S. at 827; *see also DiSabatinno*, 671 A.2d at 1349 (adopting language).

[102] *DiSabatinno*, 671 A.2d at 1349.

[103] *City of Wilmington v. Gen. Teamsters Local Union 326*, 321 A.2d 123, 125 (Del. 1974).

[104] *See DiSabattino*, 671 A.2d at 1350 ("The sanction of imprisonment can be imposed for either civil or criminal contempt of court."); *see also* 10 *Del. C.* § 370 ("The Court of Chancery may enforce obedience to its judgments by imprisonment of the body, or by sequestration of lands.").

in character and, where the primary purpose is to coerce, it is civil."[105] Issuing an arrest warrant and confining a party falls under the heading of civil contempt if the court contemplates "confining [the] contemnor indefinitely until he complies with an affirmative command."[106] "Conversely, a fixed term of imprisonment is punitive and criminal if it is imposed retrospectively for a past act of disobedience, and cannot be avoided or abated by subsequent compliance with the court's order."[107]

Here, the receiver expressly seeks a finding of civil contempt and the issuance of arrest warrants as a coercive sanction to compel compliance. He asks that the court arrest the Zhongs and hold them in custody only until they cause the Company to comply with this court's orders. The receiver identifies five ongoing acts by the Zhongs that he asserts violate the court's orders:

- Refusing to provide current financial statements of the Company;

- Refusing to turn over control of the property and assets of [the Company] and its direct (and indirect) wholly-owned and controlled subsidiaries;

- Refusing to reconstitute the Board of Directors; . . .

---

[105] *Gen. Teamsters Local*, 321 A.2d at 125; *see also DiSabattino*, 671 A.2d at 1349-50 ("[A] contempt sanction is considered civil if it is remedial, and for the benefit of the complainant. But if it is for criminal contempt the sentence is punitive, to vindicate the authority of the court." (internal quotation marks omitted) (quoting *Bagwell*, 512 U.S. at 827-28)).

[106] *DiSabattino*, 671 A.2d at 1350 (quoting *Bagwell*, 512 U.S. at 828).

[107] *Id.*

- Refusing to surrender the corporate seals and change the legal representative of the Company[; and] . . .

- Divert[ing] the assets of the Company to a new company that resides outside the control of the Receiver, in an attempt to circumvent this Court's orders and the demands of the Receiver.[108]

Because the requested arrest would only last until the contemptuous conduct ceases, the receiver seeks only civil contempt. Therefore, due process requires only that the Zhongs be afforded notice and an opportunity to be heard.

### 2. Notice

"[P]rior to an action which will affect an interest in life, liberty, or property protected by the Due Process Clause of the Fourteenth Amendment, a State must provide 'notice reasonably calculated, under all circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections.'"[109] In the case of contempt, the notice must inform the alleged contemnor "of the contempt charges and of the contempt hearing [and] must be explicit."[110] The standard for adequate notice is one of

---

[108] Dkt. 197 at 1-2 (formatting altered).

[109] *Mennonite Bd. of Missions v. Adams*, 462 U.S. 791, 795 (1983) (quoting *Mullane v. Cent. Hanover Bank & Tr. Co.*, 399 U.S. 306, 314 (1950)).

[110] *Little v. Kern Cty. Superior Court*, 294 F.3d 1075, 1081 (9th Cir. 2002).

reasonableness.[111] "Adequate notice typically takes the form of a show-cause order and a notice of hearing identifying each litigant who might be held in contempt."[112]

In my view, the Order to Show Cause already provided adequate notice to the Zhongs to satisfy due process. It identified the Zhongs as the alleged contemnors and identified the time and place of the hearing. The receiver provided the Zhongs with the Order to Show Cause and his supporting brief, which identified all of the alleged acts of contempt.

Nonetheless, the circumstances warrant taking an additional step. This proceeding is unusual because the receiver seeks to hold the Zhongs in contempt of orders which do not identify the Zhongs by name, and which impose broad mandates rather than specific demands. For example, the receiver asserts that the Zhongs have violated the Authority Paragraph, which gives the receiver authority over the Company's books, records, and

---

[111] *See Taylor v. Hayes*, 418 U.S. 488, 498-99 (1974) (explaining that the alleged contemnor is entitled to "reasonable notice of the specific charges").

[112] *Waste Mgmt. of Wash., Inc. v. Kattler*, 776 F.3d 336, 340 (5th Cir. 2015). Due process also requires that the notice be served using means "such as one desirous of actually informing the absentee might reasonably adopt to accomplish it." *Mullane*, 462 U.S. at 314-15. The "amenities of original process need not be followed." 11A Alan Wright et al., *Federal Rules of Civil Procedure* § 2956 (3d ed. 2018). Notice can be provided "by personal service *or otherwise*." Ct. Ch. R. 65(d) (emphasis added). Here, Bo received actual notice of the Order to Show Cause with ample time to respond and appear. Due process does not require more than that. *See, e.g.*, *Drywall Tapers & Pointers, Local 1974 v. Local 530, Operative Plasters & Cement Masons Int'l Ass'n*, 889 F.2d 389, 396 (2d Cir. 1989) (holding "Local 530 cannot claim that its due process rights were violated" where it "had actual notice of the [civil] contempt proceedings"); *SEC v. VTR, Inc.*, 410 F. Supp. 1309, 1314 (D.D.C. 1975) (finding non-party President of civil contemnor "received actual notice of these proceedings" and therefore "the requirements of due process have been met").

accounts, and the Cooperation Paragraph, which requires that the Zhongs cooperate with the receiver's efforts. These provisions establish general obligations, rather than directing that the Company take particular actions by a specified date. Another factor is the Zhongs' status as foreign nationals who may not have fully understood that failing to cause the Company to comply with this court's orders could place them in personal jeopardy

In my view, the court would have the authority to impose sanctions on the Zhongs at this time. Instead, on the facts of this case, the court will issue a more specific order directing the Zhongs to take the actions that the receiver has identified. This will give the Zhongs one final opportunity to comply with this court's orders and avoid the issuance of bench warrants and the potential for coercive imprisonment. Because the receiver is invoking this court's jurisdiction under Section 3114, the receiver shall serve the order in accordance with that statute, in addition to using the same methods of service used previously.

### 3. Opportunity To Be Heard

To satisfy due process, a party facing contempt must receive an opportunity to be heard "at a meaningful time and in a meaningful manner."[113] In a civil contempt proceeding, "the charged party is entitled to . . . an impartial hearing[] and an opportunity to present a defense."[114] "Neither a jury trial nor proof beyond a reasonable doubt is

---

[113] *Barry v. Barchi*, 443 U.S. 55, 66 (1979) (internal quotation marks omitted) (quoting *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965)).

[114] *Nabkey v. Hoffius*, 827 F. Supp. 450, 452 (W.D. Mich. 1993).

required."[115] Here, the Zhongs' opportunity to brief and argue the receiver's motion satisfied their due process rights.

Nonetheless, I will entertain additional hearings. "In terms of procedural due process, the Constitution sets a floor, not a ceiling."[116] If the Zhongs fail to comply with this court's more specific order, and if the receiver moves for the issuance of bench warrants, then the Zhongs may appear and oppose that motion. If requested, I will hold an evidentiary hearing at that time.[117] That step is warranted because the receiver's request for a coercive sanction of imprisonment requires careful scrutiny.[118] In addition, "[c]ontempts involving out-of-court disobedience to complex injunctions," such as the ones at issue here, "often require elaborate and reliable factfinding."[119]

---

[115] *Bagwell*, 512 U.S. at 827.

[116] *Robinson v. Gov't of the D.C.*, 234 F. Supp. 3d 14, 24 (D.D.C. 2017).

[117] *Cf. Simon v. Navellier Series Fund*, 2000 WL 1597890, at *4 (Del. Ch. Oct. 19, 2000) (Strine, V.C.) (noting that for dispositive motions under Court of Chancery 12(b) "the court has discretion to shape a process that is efficient so long as it affords the parties a fair opportunity to take discovery and/or to have any relevant factual disputes resolved after an evidentiary hearing if either is necessary to a fair determination of the motion"); *ASX Inv. Corp. v. Newton*, 1994 WL 178147, at *2 (Del. Ch. May 3, 1994) (Allen, C.) (suggesting desire to hold evidentiary hearing in connection with Court of Chancery Rule 11 sanctions "given the early stage in the proceedings at which the issue arose").

[118] *See D.G.R. v. R.C.*, 2007 WL 5158162, at *1 (Del. Fam. Dec. 5, 2007) ("This Court appreciates the severity of [imprisonment as a] sanction for civil contempt and employs it only as a last resort."); *Watson v. Givens*, 758 A.2d 510, 517 (Del. Fam. 1999) ("The Court is mindful that with the authority to incarcerate comes the responsibility that this authority should be used as a last resort and not a first resort to obtain compliance with the Court's order.").

[119] *Bagwell*, 512 U.S. at 833-34.

### III.  CONCLUSION

The receiver shall submit a form of order directing the Zhongs to take or cause the Company to take specific actions to address the areas that the receiver has identified as constituting violations of the court's orders. The order shall give the Zhongs sixty days to comply. Once entered, the receiver shall give the Zhongs notice of the order by using the same methods that the receiver has used to date and by additionally serving a copy of the order as contemplated by Section 3114(c).

If the Zhongs fail to comply, then the receiver may renew its application for an order to show cause that would result in the issuance of bench warrants for the Zhongs' arrest. The Zhongs may oppose that application. If requested, the court will hold an evidentiary hearing. In any event, the Zhongs will be able to purge the sanction of coercive imprisonment at any time by complying with the court's orders.